## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **BOSTON BLACKIES MANAGEMENT, INC.,** | ) **CASE NO. 09-44643** |
| **et al.,** | ) **(Jointly Administered)** |
| | ) **In Chapter 11** |
| Debtors and Debtors-in Possession. | ) |
| | ) |
| | ) The Honorable Jack B. Schmetterer, |
| | ) Presiding |
| | ) |
| | ) Hearing  December 29, 2009 |
| | ) |
| | ) 11:00 am CST |

**FINAL ORDER AS TO GENERAL ELECTRIC CREDIT CORPORATION
(I) AUTHORIZING POST-PETITION SECURED
SUPER-PRIORITY FINANCING PURSUANT TO BANKRUPTCY
CODE SECTIONS 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d),
(II) GRANTING ADEQUATE PROTECTION PURSUANT TO
SECTION 364 OF THE BANKRUPTCY CODE, AND (III)
ALLOWING USE OF CASH COLLATERAL
AND INTERIM ORDER AS TO BLC LLC/CIENA CAPITAL LLC
ALLOWING USE OF CASH COLLATERAL**

**THIS CAUSE COMING ON TO BE HEARD ON** the continued motions of debtors,

Boston Blackies of Arlington Heights, LLC; Boston Blackies Naperville, LLC; Boston Blackies

of Winnetka, Inc.; Boston Blackies of Riverside Plaza, Inc.; Boston Blackies Lake Cook Plaza,

Inc.; Boston Blackies Management, Inc.; and 164 Grand, Inc. (collectively, the "Debtors"), for

entry an order for final approval of debtor-in-possession financing pursuant to Bankruptcy Code

§364 and permitting them to use cash collateral belonging to GE CAPITAL CORP. ("GECC")

and BLC LLC/CIENA CAPITAL LLC ("Ciena"), it appearing to the Court that an interim order

authorizing debtor-in-possession financing was entered by this Court on December 1, 2009,

*102*

(Doc. No. 33) and interim orders permitting use of cash collateral was entered by this Court on November 25, 2009, December 15, 2009, and December 23, 2009, the Debtors having given notice to all creditors and parties in interest pursuant to Bankruptcy Rule 4001(b); Debtors having represented to the Court that they further require use of cash collateral; Debtors having represented to the Court that Ciena holds a first lien on the assets in Boston Blackies of Riverside Plaza, Inc. and GECC holds a first lien on all of the jointly administered debtors assets except Boston Blackies of Riverside Plaza, Inc. where it holds a second lien; the Court having jurisdictiion over this core proceeding and Court being duly advised in the premises:

**IT IS HEREBY FOUND THAT**:

A.      On November 24, 2009 (the "Petition Date"), the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

B.      The Debtors have continued as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  The Court has not directed the appointment of a trustee or examiner in these cases, no party in interest has requested the appointment of a trustee or examiner, and the United States Trustee has not formed an official creditors committee.

C.      This Court has jurisdiction, pursuant to 28 U.S.C. § 1334, over these cases, and over the persons and property affected hereby. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  Venue is proper pursuant to 28 U.S.C. §§ 1409 and 1409.  The statutory authority for this motion is 11 U.S.C. §§ 105, 361, 363 and 364.  Rule 4001 of the Federal Rules of Bankruptcy govern the procedural aspects of this motion.

<u>**Debtors' Financing Needs**</u>

D.      The Debtors have represented that they operate a chain of quick-service restaurants in the greater Chicago metropolitan area.  The Debtors believe they are viable businesses who have overextended themselves in financing a series of failed expansion projects.

- 2 -

The Debtors concede that debt service payments on their financing and other expenses have depleted the Debtors' cash on hand to the point where they will be unable to continue operating absent additional financing in the near future. The Debtors believe that the primary value of the Debtors' assets is in the Debtors' business enterprise value. The Debtors also believe that if they cease operating, their business enterprise value will be lost or greatly diminished, harming all creditors.

E.    Except as noted below, GECC holds a first-priority security interest in and lien upon substantially all of the Debtors' personal property and other assets, including, without limitation, all cash, equipment[1], inventory, accounts receivable and intellectual property of debtors 164 Grand, Inc.; Boston Blackies of Arlington Heights, LLC; Boston Blackies Lake Cook Plaza, Inc.; Boston Blackies Management, Inc.; Boston Blackies Naperville, LLC; Boston Blackies Winnetka, Inc.; and Donick Holdings, Inc., and a second-priority security interest in and lien upon substantially all of the personal property and other assets, including, without limitation, all cash of debtor Boston Blackies of Riverside Plaza, Inc. (collectively, the "Prepetition Collateral").[2] The Prepetition Collateral includes but is not limited to, funds held in bank accounts maintained by Debtors on the Petition Date, which funds constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"). The Prepetition Collateral secures outstanding prepetition indebtedness totaling $6,002,797.13 (inclusive of principal, interest, default interest, fees and other costs) as of the Petition Date (the "Prepetition Loan").

---

[1] Total Management Systems, Inc. appears to have a prime purchase money security interest in certain dish washing equipment.

[2] Cienna f/k/a Business Loan Center, LLC n/k/a ("Business Loan") asserts a first-priority security interest in and lien upon substantially all of the personal property and other assets, including, without limitation, all cash of debtor Boston Blackies of Riverside Plaza, Inc.

1827439.3

F.      The Debtors believe that immediate, critical and ongoing need exists for them to obtain funds with which to administer and preserve the value of its estate. Without such funds, the Debtors assert that they will not be able to pay their payroll and other direct operating expenses or carry on their business during this sensitive period in a manner that will avoid irreparable harm to the Debtors' estates. At this time, the Debtors maintain that their ability to finance their operations and the availability to them of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations are vital to the confidence of the Debtors' vendors, suppliers of other goods and services, to their customers, their employees; to the preservation and maintenance of the going concern value of the Debtors' estate and the possibility for a successful reorganization.

G.      In addition, the Debtors argue that they are dependent on financing to pay professionals. Immediately before the Petition Date, GECC advanced $25,000 to the Debtors to pay its counsel a pre-petition retainer. Without that advance, the Debtors would have been unable to obtain counsel to represent them in preparing petitions and schedules necessary to file these bankruptcy cases.

H.      The Debtors have represented that they are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, or to obtain secured credit, allowable only under Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d), except under the terms and conditions provided in this Order.

I.      The Debtors further represent that they are unable to obtain credit for borrowed money without granting liens on Debtors' assets pursuant to Bankruptcy Code sections 364(c), as provided by this Order.

- 4 -

J.       Based upon the Debtors' representation, the relief requested in the Motion is necessary, essential, and appropriate for the continued operation of the Debtors' management and preservation of their business enterprise value.

K.       GECC has agreed to make a $500,000 debtor-in-possession loan to the Debtors (the "DIP Loan"), secured by the Collateral defined in this Order and subject to the following conditions:

(a)       total principal indebtedness under the DIP Loan will not exceed $500,000;

(b)       interest rate shall be 950 basis points above the 90-day London Inter-Bank Offering Rate as reported in the *Wall Street Journal* ("LIBOR");

(c)       a commitment fee of 2% of the sums loaned;

(d)       payment on the DIP Loan, including accrued interest, shall be due in full on the earliest to occur of  April 1, 2010, or the occurrence of an Event of Default defined in this Order or in the DIP Loan Documents  (the "Maturity Date");

L.       It is in the best interest of the Debtors' estate to be allowed to enter into the DIP Loan with GECC.

M.       The terms and conditions of the DIP Loan are fair and reasonable and are believed by the Debtors to be the best available under the circumstances.

N.       The terms of this Order were negotiated at arm's length, in good faith and not by any means forbidden by law.  The loan advances to be made under the DIP Loan will be so extended in good faith, in consequence of which GECC is entitled to the protection and benefits of Bankruptcy Code section 364(e).

O.       Debtors' counsel has certified that a copy of the Motion (together with copies of the proposed DIP Loan Agreement annexed thereto) and notice of the final hearing on the

- 5 -

1827439.3

Motion have been served either by electronic mail, telecopy transmission, hand delivery, overnight courier or First Class United States mail upon the United States Trustee, Business Loan, GECC, the State of Illinois, and all creditors known to have any liens against the Debtors' assets. The notice of the hearing at which this Order was entered constitutes adequate notice under the circumstances in accordance with Bankruptcy Rule 4001(c), Bankruptcy Rules 4001(b) and (c) and Bankruptcy Code section 102(l), as required by Bankruptcy Code sections 364(c) and 364(d) in light of the emergency nature of the relief requested in the Motion.

P.    Good cause has been shown for the entry of this Order and authorization for Debtors to obtain loans and other credit from GECC pursuant to the DIP Loan Agreement pending a final hearing pursuant to Bankruptcy Rule 4001(c)(2). The Debtors' need for financing of the type afforded by the DIP Loan Agreement is immediate and critical. Entry of this Order will enable the Debtors to preserve the assets of his estate, will increase the possibility of a successful reorganization of the Debtors and is in the best interests of Debtors, their creditors and their estate. The terms of the financing authorized hereby appear fair and reasonable, reflect Debtors' exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

**NOW THEREFORE**, on the Motion of the Debtors and the record before the Court with respect to the Motion made by the Debtors, and good cause appearing, it is hereby **ORDERED**:

<div align="center">

**Approval of the DIP Loan Documents and
Authorization as to Borrowing and Granting of Liens,
<u>Security Interests, and Administrative Priority Claim</u>**

</div>

1.    Subject to the other terms and conditions of this Order, the terms and the conditions of the Loan and Security Agreement attached as **Exhibit A** (collectively, the "DIP Loan Documents") are hereby approved, as follows:

<div align="center">- 6 -</div>

(a)     the total amount of the DIP Loan to be provided by GECC pursuant to the terms and conditions of this Order shall be $500,000,

(b)     the proceeds of the DIP Loan shall be used by the Debtors solely for the purposes described in the Debtors' operating budget attached hereto as **Exhibit B** (the "Budget") subject to the variances described in this Order.   The Debtors and GECC reserve the right to amend the budget, which amended budget shall be filed with the Court.  The Debtors shall submit to GECC a 13-week rolling budget that the Debtors will update every two weeks.  The Debtors may exceed any one line item of the budget by no more than 10% and may not exceed the total budget by more than 5%;

(c)     GECC will advance proceeds under the DIP Loan in accord with the Budget, subject to GECC's approval;

(d)     provided the Debtors have repaid GECC's Prepetition Loan, the Debtors may pre-pay the DIP Loan in full or in part at any time;

(e)     the Debtors are authorized to satisfy the conditions to the financing set forth above, and is directed to perform all obligations hereunder in accordance with the terms hereof and the provisions of the DIP Loan Documents;

(f)     interest due on the Obligations (defined herein) shall be paid at 950 basis points above LIBOR;

(g)     an origination fee of 2% shall be paid by the debtor at the closing of the loan;

(h)     the maturity date of the DIP Loan shall be payment on the DIP Loan, including accrued interest, shall be due in full on the earliest to occur of (i) April 1, 2010; (ii) the date the case is converted to a chapter 7 case; (iii) the date a Chapter 11 Trustee is

- 7 -

appointed; (iv) the date the case is dismissed; (v) the date that the assets are sold pursuant to a confirmed plan of reorganization or 11 U.S.C. § 363; or (vi) the occurrence of an Event of Default defined in this Order or in the DIP Loan Documents (the "Maturity Date");

2.     The Debtors are hereby authorized and directed to do and perform all acts and to make, execute, deliver, record or file all instruments and documents which GECC may request to evidence the Debtors' obligations and the Liens (defined herein) as provided in the DIP Loan Documents and the perfection of such Liens.

3.     As security for the Debtors' obligations arising under this Order (collectively, the "Obligations"), GECC shall have and is hereby granted (effective as of the Petition Date), pursuant to Bankruptcy Code section 364(c)(2), prime security interests and liens (collectively, the "Liens" or "Lien") in the following properties of the Debtors with the following priorities:[3]

(i)  First-priority, perfected, valid, and enforceable Liens upon all personal property of debtors: 164 Grand, Inc.; Boston Blackies of Arlington Heights, LLC; Boston Blackies Lake Cook Plaza, Inc.; Boston Blackies Management, Inc.; Boston Blackies Naperville, LLC; Boston Blackies Winnetka, Inc.; and Donick Holdings, Inc., a none debtor, including, without limitation, all of those Debtors' accounts; inventory; equipment[4]; vehicles; general intangibles (including all claims and counterclaims in any present and future litigation involving the Debtors); insurance proceeds; computer hardware, operating systems and software; intellectual property (including, but not limited to, all trade and service marks; patents and patent applications, copy rights, trade

---

[3] GECC already holds the first priority perfected lien on all assets of the Debtors other than the assets of Boston Blackies of Riverside Plaza, Inc., on which GECC hold a second priority perfected lien.

[4] Nothing in this order shall be construed to prejudice the rights of Total Management Inc.'s rights, if any in certain dishwashing equipment.

- 8 -

names and recipes)  all of the Debtors' intangible personal property, including, but not limited to, investment property, documents, instruments, chattel paper, deposit accounts and cash, books and records; and all cash and non-cash proceeds of the foregoing items other than causes of action arising under chapter 5 of the Bankruptcy Code (the "First Priority Collateral")).

(ii) Boston Blackies of Riverside, Inc. grants a second-priority, perfected, valid and enforceable Lien upon all personal property of debtor Boston Blackies of Riverside Plaza, Inc., including, without limitation, all of the Boston Blackies of Riverside Plaza, Inc.'s accounts, inventory, equipment, general intangibles (including all claims and counterclaims in any present and future litigation by the Debtors), intellectual property (including, but not limited to, all of the Debtors' intellectual property, investment property, documents, instruments, chattel paper, deposit accounts, books and records of Debtors' insurance proceeds, and all cash and non-cash proceeds of the foregoing items. (the "Second Priority Collateral,") and together with the First Priority Collateral, the "Collateral"));

4.    The Debtors shall not transfer the proceeds of the DIP Loan, the proceeds of the Collateral or any portion of the revenue from their respective businesses to any of their affiliate entities or insiders, including, but not limited to, Boston Blackies of Lincoln Park, LLC or Boston Blackies of Skokie, Inc. Notwithstanding anything above to the contrary, the Debtors may pay reasonable rent to insiders or affiliates, as provided in the budget, or a salary to Chris Giannis.

5.    The obligations created under this Order shall also be an allowed administrative expense claim (the "Super-Priority Claim") with priority under Bankruptcy Code section

1827439.3

364(c)(1) and otherwise over all administrative expense claims and unsecured claims against the

Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without

limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy

Code sections 326, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c),726(b) and 1114 as to parties

given notice as required by Bankruptcy Code section 364(c) but not as to wages and salaries

under Bankruptcy Code section 503(b)(1).  Any Bankruptcy Code section 506(c) administrative

expense will be limited to $50,000 subject to the priorities of claims provided in Bankruptcy

Code section 507.  No costs or expenses of administration incurred in these chapter 11 cases are,

or will be, prior to or on a parity with the Obligations arising under the DIP Loan Documents, or

with any other claims of GECC arising hereunder. Notwithstanding the above, unsecured claim

of the United States Trustee the fees due the United States Trustee pursuant to 28 U.S.C. § 1930

shall be of a higher priority than the unsecured claims of GECC. Also, notwithstanding anything

above to the contrary, nothing in this paragraph requires the attorney for the debtor to disgorge

any fees that he received either pursuant to a court approved retainer, an interim fee order or

through any future carve out nor does it divest authority of the Court to order disgorgement

under appropriate circumstances.

6.      Any payments made by the Debtors to GECC shall first be credited to the secured

portion of GECC's Prepetition Loan and then to the DIP Loan.

7.      All Obligations shall be due and payable upon the Maturity Date.  Unless and

until the Obligations are paid in full, the protections afforded to GECC under this Order, and any

actions taken pursuant thereto, shall survive the entry of any order confirming a plan of

reorganization or converting the Debtors' case into a case pursuant to Chapter 7 of the

Bankruptcy Code, and the Liens provided herein shall continue to be valid and enforceable in the

1827439.3

event that one or more of the jointly administered cases is converted to a case under Chapter 7 of the Bankruptcy Code, and such Liens shall maintain their priority as provided by this Order until the Obligations have been satisfied in full.

8.     The time and manner of payment of the Obligations pursuant to the terms of this Order, the Liens in and to the Collateral and the Super-Priority Claim shall not be altered or impaired by any plan of reorganization which may hereafter be confirmed, or by any other order which may hereafter be entered in this case and the other jointly administered cases.

## Cash Collateral Approval

9.     Provided that there is no event of default, the Debtors are authorized to utilize cash collateral to the extent needed, pursuant to the same terms and conditions listed in the November 25, 2009, order and the 13 week rolling budget as filed with the Court.

10.     Cienna is granted a prime replacement lien on the proceeds of the accounts receivable and inventory of the Debtor-in-possession, Boston Blackies of Riverside Plaza, Inc. subject to verification of the amount, perfection, priority and validity of its security interest and shall be paid a single interim adequate assurance payment in the amount of $1,000.00 until further order of Court.

11.     Subject to the lien of Cienna as to the assets of Debtor, Boston Blackies of Riverside Plaza, Inc. only, GECC is granted a prime replacement lien on the proceeds of the accounts receivable and inventory of the jointly administered Debtors in Possession, subject to verification of the amount, perfection, priority and validity of its security interest.

## Events of Default

12.     The following shall constitute an event of default under this Order and the DIP Credit Agreement provided herein (hereinafter "Event of Default"):

- 11 -

1827439.3

(a)     Debtors shall fail to comply with any of the terms and conditions of this Order in any material respect;

(b)     a trustee shall be appointed in these Chapter 11 cases;

(c)     an examiner shall be appointed in these Chapter 11 cases with enlarged powers (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(d)     these Chapter 11 cases shall be dismissed or converted to cases under Chapter 7;

(e)     an event of default under any provision of the DIP Loan Documents;

(f)     the Debtors exceed any 13-week Budget line item by more than 10% or exceed any 13-week Budget total by more than 5%;

(g)     the Debtor's make an impermissible transfer under paragraph 4 of this order or

(h)     the Debtors terminate, reject or breach the Professional Services Agreement among the Debtors and Trigild, Inc.

<u>**Remedies upon a Post-Petition Event of Default**</u>

13.     Any automatic stay otherwise applicable to GECC shall remain in effect, subject to the right of GECC to seek expedited relief from the automatic stay upon the occurrence of an Event of Default and at any time thereafter, and without further order of the Court, GECC may declare the principal of and accrued interest, fees and other liabilities constituting the Obligations to be due and payable.

14.     After an Event of Default, the Debtors shall have no right to use the proceeds advanced under the DIP Credit Agreement or GECC's cash collateral other than towards the satisfaction of the Obligations.  In no event shall the Debtors be authorized to use any proceeds

- 12 -

of the DIP Loan to pay any cost or expenses of administration in these Chapter 11 cases or in any superseding Chapter 7 cases after the occurrence of an Event of Default and the notice period provided in this Order until such time as all of the Obligations are paid and satisfied in full.

### Miscellaneous Provisions

15.     Consistent with 11 U.S.C. § 364(e), if any or all of the provisions of this Order are hereafter modified, vacated or stayed:

(a)     such stay, modification or vacation shall not affect the validity of any obligation incurred pursuant to this Order where such obligation was incurred prior to the effective date of such stay, modification or vacation, nor shall such stay, modification or vacation affect the validity, enforceability or priority of any Lien securing such obligation;

(b)     any obligation incurred by Debtors to GECC under this Order prior to the effective date of such stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and GECC shall be entitled to all the rights, remedies, privileges and benefits, including the Liens and priorities granted herein with respect to any such obligation; and

(c)     the indebtedness resulting from the DIP Loan made prior to the effective date of any stay, modification or vacation of this Order cannot (i) be subordinated, (ii) lose its priority lien or super-priority administrative expense claim status, or (iii) be deprived of the benefit of the status of the liens, security interests and claims granted to GECC under this Order as a result of any subsequent order in these Chapter 11 cases, or any superseding cases, of Debtors.

16.     All the payments made to GECC, and the Liens and the Super-Priority Claim granted to GECC under this Order, and the priority thereto shall be binding on the Debtors, any

- 13 -

1827439.3

successor trustee for the Debtors' estates, and all creditors of the Debtors who were given notice

as required by Bankruptcy Code section 364(c).

17.    GECC and the Debtors may modify the Budget or amend or waive any provision

of this Order or the DIP Loan Documents, provided that such waiver or modification shall not be

effective unless set forth in writing, signed by the parties hereto and approved by the Court upon

written application and after notice and a hearing.

### No Preclusive Effect On Illinois Department of Revenue's Right to Trust Fund Taxes

18.    Nothing in this order shall be construed to preclude the Illinois Department of

Revenue from attempting to establish that funds held by the debtor-in-possession or any other

party are held in trust for the Department and shall not preclude the Department from seeking

additional relief with respect to those funds.  Likewise, nothing in this order shall preclude the

debtor-in-possession or any creditor from challenging any such assertions or contending that any

such funds are not held in trust for the Department.  The security interests provided for herein

shall not diminish in any way the rights, if any, of the Department as a trust fund claimant to

obtain possession of funds subject to its trust claims or to impose any additional liability on the

holder of the trust funds to the extent allowed by law.  Funds which the Court, after notice and

hearing, may determine constitute trust funds of the Department shall not constitute the collateral

of any secured creditor.

1827439.3

19.    Interim use of cash collateral belonging to Ciena shall expire on January 26, 2010

and a status hearing on the continued use cash collateral belonging to Ciena is set for January 25,

2010 at 10:30 a.m. upon notice to its counsel who have appeared in the above captioned matter.

SIGNED    *Dec 29, 2009*

UNITED STATES BANKRUPTCY JUDGE

1827439.3

## LOAN AND SECURITY AGREEMENT

THIS **LOAN AND SECURITY AGREEMENT** (as it may be amended, restated, supplemented, extended or renewed from time to time, this "*Agreement*") is made as of _____, 2009, between **GENERAL ELECTRIC CAPITAL CORPORATION**, a Delaware corporation ("*Lender*"), and **BOSTON BLACKIES OF ARLINGTON HEIGHTS, LLC**, an Illinois limited liability company, **BOSTON BLACKIES LAKE COOK PLAZA, INC.**, an Illinois corporation, **164 GRAND, INC.**, an Illinois corporation, **BOSTON BLACKIES NAPERVILLE LLC**, an Illinois limited liability company, **BOSTON BLACKIES OF RIVERSIDE PLAZA, INC.**, an Illinois corporation, **BOSTON BLACKIES OF WINNETKA, INC.**, an Illinois corporation, and **BOSTON BLACKIES MANAGEMENT, INC.**, an Illinois corporation ("*Borrower*," with references to Borrower meaning each Borrower, jointly and severally, if more than one Borrower is executing this Agreement).

FOR VALUABLE CONSIDERATION, the parties agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1     Definitions.  In addition to terms otherwise defined in this Agreement, the following terms have the following meanings:

"*Advance*" means each disbursement of the Loan proceeds.

"*Affiliate*" means, with respect to any Person, each officer, director, general partner or joint-venturer of such Person and any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such Person.

"*Applicable Law*" means, with respect to any Person, collectively, the common law and all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property, to which such Person or any of its property is subject, or that are otherwise applicable in the circumstances.

"*Bankruptcy Cases*" means the bankruptcy cases filed by the Borrowers in the Bankruptcy Court.

"*Bankruptcy Court*" means the United States Bankruptcy Court, [**Northern District of Illinois, Chicago Division**].

"*Books and Records*" means all books, records, board minutes, contracts, licenses, insurance policies, environmental audits, business plans, files, computer files, computer discs and other data and software storage and media devices, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities and any and all records and instruments relating to the Collateral or Borrower's business.

"*Borrower Parties*" means and includes each of the Credit Parties and their respective Affiliates.

"*Budget*" means [the budget submitted and approved by the Bankruptcy Court as part of the motion to approve the Loan].

"*Business Day*" means any day of the year that is not a Saturday, Sunday or a day on which banks are required or authorized to close in Phoenix, Arizona or New York, New York.

Contract No. _____
Asset Nos.: 056453 et al.

**<u>Exhibit A</u>**

"*Capital Lease*" means, with respect to any Person, any lease of, or other arrangement conveying the right to use, any property (whether real, personal or mixed) by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.

"*Change of Control*" means a change in Control of any of the Credit Parties, voluntary or involuntary, including a change in Control resulting from (a) direct or indirect transfers of beneficial ownership of, or the right and power to vote, stock or partnership, membership or other ownership interests, whether in one or a series of transactions; (b) the creation or issuance of new or additional equity interests; or (c) the change, resignation, or removal of any manager or trustee.

"*Collateral*" means all of the following described property, whether now owned or hereafter acquired and wherever located, together with all replacements and substitutions therefor and all cash and non-cash proceeds (including insurance proceeds and any title and UCC insurance proceeds) and products thereof, and, in the case of tangible Collateral, together with all additions, attachments, accessions, parts, equipment and repairs now or hereafter attached or affixed thereto or used in connection therewith: All of Borrower's right, title, and interest in: (a) all types of property included within the term "equipment" as defined by the UCC (except vehicles, boats and airplanes), including machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment; (b) all inventory, including all goods held for sale, raw materials, work in process and materials or supplies used or consumed in Borrower's business; (c) all documents; general intangibles; accounts; contract rights; chattel paper and instruments; money; securities; investment properties; deposit accounts; supporting obligations; letters of credit and letter of credit rights; commercial tort claims; and records, software and information contained in computer media (such as data bases, source and object codes and information therein), together with any equipment and software to create, utilize, maintain or process any such records or data on electronic media; (d) any and all plans and specifications, designs, drawings and other matters prepared for any construction on any real property owned by or leased to Borrower or regarding any improvements to any of such real property; (e) goodwill and (f) all intellectual property, including the goodwill associated therewith and the right to sue for past, present and future infringement thereof throughout the world; *provided, however,* that the security interest in any franchise, license, or distributorship agreement is subject to the provisions of Section 9-408 of the UCC. References in the Loan Documents to the Collateral include all or any portion of or interest in any of the Collateral.

"*Contractual Obligation*" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument, or other undertaking (other than a Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"*Control*" and "*Controlled*" as used in the definition of "*Affiliate*" and in the definition of "*Change of Control*", means and refers to the possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of any class of voting securities (or other ownership interests) of such Person; or (b) the power to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"*Credit Parties*" means Borrower, Guarantor and each other Person (other than Lender) that is or may become a party to this Agreement or any other Loan Document.

"*Default*" means any Event of Default or any event that, with the passage of time or the giving of notice or both, would become an Event of Default.

"*Default Rate*" means a per annum interest rate equal to six percentage points added to the Variable Rate, as the Variable Rate changes from month to month.

"*Funding Cut-Off Date*" means January 29, 2010.

"*GAAP*" means generally accepted accounting principles in the United States, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of

Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board and in such other statements by such other entity as may be in general use by significant segments of the accounting profession that are applicable to the circumstances as of the date of determination.

"*Governmental Authority*" means any nation, sovereign or government; any state or other political subdivision thereof; any agency, authority or instrumentality thereof or of any such state or political subdivision; and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity and any self-regulatory organization (including the National Association of Insurance Commissioners).

"*Guarantor*" means each Person that guarantees all or any portion of the Obligations, and their respective heirs, personal representatives, administrators, successors and assigns. References to "*Guarantor*" are to each Guarantor.

"*Guaranty*" means the guaranty signed by each Guarantor, as amended, restated, supplemented, extended or renewed from time to time.

"*Indebtedness*" means, without duplication, all of the following, whether or not matured: (a) indebtedness for borrowed money; (b) obligations evidenced by bonds, debentures, notes, or similar instruments; (c) reimbursement and other obligations with respect to letters of credit and acceptances; (d) obligations representing the deferred purchase price of property or services; (e) obligations created or arising under any conditional sale or other title retention agreement; (f) obligations with respect to Capital Leases; and (g) any other obligation for borrowed money or other financial accommodation (direct or contingent), whether evidenced by a note, instrument, guaranty or other writing and whether contingent, unliquidated or disputed.

"*Lease*" means the lease described on *Schedule 1* for the Site, together with all amendments, restatements, extensions, supplements, and exhibits to the lease, as in effect on the Closing and in the future. If there is more than one Site identified on Schedule 1, then references in this Agreement and the other Loan Documents to "Lease" mean to each Lease for each particular Site.

"*Lender Parties*" means Lender, each of its Related Persons, and the Affiliates of the Related Persons.

"*Liabilities*" means all claims, actions, suits, judgments, damages, losses, liabilities, obligations, responsibilities, fines, penalties, sanctions, costs, fees, Taxes, commissions, charges, disbursements and expenses, in each case of any kind or nature (including interest accrued thereon or as a result thereof and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, and whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, lien (statutory or other), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"*Loan*" means the financing provided by Lender to Borrower in accordance with this Agreement. The Loan is being made for the "*Financing Purpose*" for the Site as set forth on *Schedule 1*.

"*Loan Amount*" means the portion of the "*Amount of Financing*" specified on *Schedule 1* that is actually advanced to Borrower. In no event will Borrower be allowed to borrow more than the "Maximum Loan Amount" as set forth on *Schedule 1*.

"*Loan Documents*" means, collectively, this Agreement, the Note, the Guaranty, and all other guaranties, security agreements, assignments, mortgages, landlord agreements, subordination agreements and all other documents, instruments, certificates and notices at any time delivered in connection with the Loan (other than Related Agreements), all as they may be amended, restated, supplemented, extended or renewed from time to time.

"*Loan Term*" means the period commencing on the Closing Date and ending on the Maturity Date.

"*Material Adverse Effect*" means any fact, event or circumstance that, alone or when taken with other events or conditions occurring or existing concurrently with such event or condition (a) has or is reasonably expected to have a material adverse effect on the business, assets, operations, condition (financial or otherwise), or prospects of Borrower or any other Borrower Party; (b) materially impairs or is reasonably expected to materially impair the ability of Borrower or any other Credit Party to pay and perform their obligations under the Loan Documents to which they are a party; (c) materially impairs or is reasonably expected to materially impair the ability of Lender to enforce its rights and remedies under any Loan Document; or (d) has or is reasonably expected to have any material adverse effect on the Collateral, the Liens of Lender in such Collateral or the priority of such Liens.

"*Maturity Date*" earlier of (a) April 1, 2010, (b) confirmation of a plan of reorganization in the Bankruptcy Case or sale of substantially all of the assets pursuant to 11 U.S.C. §363 and (c) dismissal of the Bankruptcy Cases or conversion of the Bankruptcy Cases to cases under Chapter 7 of Title 11 of the United States Code.

"*Note*" means Borrower's promissory note to Lender evidencing the Loan, as amended, restated, extended, supplemented, substituted, or renewed from time to time. The Note will be in the Maximum Loan Amount. If more than one Site is included on *Schedule 1*, then the Note will be in the aggregate amount of the Maximum Loan Amounts for all of the Sites.

"*Obligations*" means, with respect to any Borrower Party, all amounts, obligations, liabilities, covenants and duties of every type and description (including for the payment of money), owing by such Borrower Party to Lender or any other Lender Party arising out of, under, or in connection with any Loan Document or any other Related Agreement, whether direct or indirect, absolute or contingent, due or to become due, liquidated or not, now existing or hereafter arising, however acquired, and whether or not evidenced by any instrument, including, without duplication: (a) if such Borrower Party is Borrower, the Loan; (b) all interest, whether or not accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or similar proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding; and (c) all other fees, expenses (including fees, charges and disbursement of counsel), interest, commissions, charges, costs, disbursements, indemnities and reimbursement of amounts paid and other sums chargeable to such Borrower Party under any Loan Document or Related Agreement.

"*Operating Lease Expenses*" means all payments and expenses incurred by Borrower with respect to each Lease and with respect to any and all other operating leases during the period of determination, all determined in accordance with GAAP.

"*Outside Closing Date*" means [December 4, 2009].

"*Permit*" means, with respect to any Person, any permit, approval, consent, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, any other Contractual Obligation or filing with, or other action or grant by, any Governmental Authority or other Person, in each case applicable to or binding on such Person, its property, or to which such Person or any of its property is subject, whether or not having the force of law.

"*Permitted Concept*" means the concept set forth on *Schedule 1*.

"*Permitted Liens*" means as set forth in **Section 5.5**.

"*Person*" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"*Related Agreement*" means each agreement and instrument, other than the Loan Documents, currently existing or entered into in the future, between, among or by any of the Borrower Parties (including any predecessor-in-interest to any of the Borrower Parties and including Affiliates of such predecessors-in-interest) and, or for the benefit of, Lender or any Lender Party (including any predecessor-in-interest to Lender or such Affiliate), including notes and guaranties.

"*Related Persons*" means, with respect to any Person, (a) each Affiliate of such Person; (b) each director, officer, employee, agent, trustee, representative, attorney, and accountant of such Person or such Person's Affiliates; and (c) each insurance, environmental, and other adviser or consultant of or to such Person or such Person's Affiliates.

"*SBA*" means the United States Small Business Administration.

"*Site*" means the property listed on *Schedule 1*, including all buildings and other improvements thereon and all rights and privileges appurtenant thereto. If more than one property is listed on *Schedule 1*, each such additional property will also be deemed to be a Site and all references in this Agreement or any of the other Loan Documents to "*Site*" shall mean each of the Sites listed on *Schedule 1*.

"*Subordination Agreement*" means the Subordination Agreement executed by **NICK GIANNIS, DONNA GIANNIS and CHRIS GIANNIS**, as such agreement may be amended, restated, supplemented, extended or renewed from time to time.

"*Subordinated Debt*" means all Indebtedness of Borrower and its consolidated Affiliates that is subordinated to the Obligations pursuant to the Subordination Agreement.

"*Tax Affiliate*" means Borrower and its subsidiaries (if any) and any Affiliate of Borrower with which Borrower files or is eligible to file consolidated, combined or unitary tax returns.

"*Taxes*" means all taxes, levies, assessments, imposts, deductions, or withholdings imposed by any Governmental Authority, and all liabilities with respect thereto, excluding taxes imposed on or measured by the net income of Lender.

"*UCC*" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect in the State of Arizona.

"*Variable Rate*" means a rate per annum equal to the spread of 9.50% added to the Variable Rate Base in effect on the last Business Day of the month preceding a particular Variable Rate Set Date, and the rate so determined will be effective from and including such Variable Rate Set Date to, but not including, the next Variable Rate Set Date.

"*Variable Rate Base*" means a rate per annum (rounded upwards, if necessary, to the nearest 1/100th of 1%) equal to the 90-day London Interbank Offered Rate as published in *The Wall Street Journal*. If for any reason such rate is no longer published in *The Wall Street Journal*, Lender shall select such replacement index as Lender in its sole discretion determines most closely approximates such rate.

"*Variable Rate Set Date*" means the Closing Date and the first day of each succeeding calendar month following the month in which the Closing Date occurs.

1.2   UCC Terms.   The following terms have the meanings given to them in the applicable UCC: "*account*", "*account debtor*", "*chattel paper*", "*commercial tort claim*", "*deposit account*", "*document*", "*equipment*", "*fixtures*", "*general intangible*", "*goods*", "*instrument*", "*inventory*", "*investment property*", "*letter-of-credit rights*", "*payment intangible*", "*proceeds*", "*software*" and "*supporting obligation*".   To the extent that the UCC is used to define any term in any Loan Document and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 of the UCC shall govern.

1.3   Accounting Terms and Principles.   All accounting determinations required to be made pursuant to any of the Loan Documents shall, unless expressly otherwise provided in the Loan Documents, be made in accordance with GAAP.   If there is a change in GAAP following the date of this Agreement and that change is implemented by Borrower, such change shall not be given effect if such change would affect a calculation that measures compliance with, or entitles Borrower or any other Credit Party to any rights under, any provision of the Loan Documents unless Borrower and Lender agree in advance and in writing to modify such provisions to reflect such changes, and, unless such provisions are modified, all financial statements, compliance certificates and similar documents provided under or pursuant to the Loan Documents shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change.

## ARTICLE 2
## THE TRANSACTION

2.1   The Loan.   Subject to the terms and conditions of this Agreement, Lender agrees to make the Loan to Borrower and Borrower agrees to borrow the Loan from Lender.   The Loan will be made available for the Financing Purpose specified on *Schedule 1*.   The Loan shall be disbursed in up to four Advances prior to the Funding Cut-Off Date.   The aggregate sum of the Advances shall not to exceed the Loan Amount.   Notwithstanding any provision of this Agreement and the Loan Documents to the contrary, the Advances may not be re-borrowed or re-advanced.

2.2   The Note.   The Loan will be evidenced by the Note and secured by the Collateral, as provided in the Loan Documents.   Borrower agrees to repay the outstanding principal amount of the Loan together with interest thereon in accordance with the terms and conditions of this Agreement, the Note, and the other Loan Documents.

2.3   Closing.   The Loan will be funded by wire transfer of immediately available funds, subject to any prorations and adjustments required by this Agreement, when each of the conditions precedent set forth in *Section 2.5* has been satisfied, such funding being referred to as the "*Closing*".   The date on which the Closing occurs is the "*Closing Date*".   The Closing must occur on or before the Outside Closing Date, and if the Closing has not occurred on or before the Outside Closing Date, Lender is not obligated to make, nor is Borrower entitled to borrow, the Loan.   Lender may extend the Outside Closing Date in Lender's sole and absolute discretion.

2.4   Fees, Costs, and Expenses.

(a)   Loan Fee.   At Closing, Borrower will pay Lender a non-refundable loan fee in the amount of 2% of the Loan Amount.

(b)   Transaction Costs.   Borrower agrees to pay to Lender, at or prior to Closing, all reasonable out-of pocket costs and expenses incurred by or on behalf of Lender in connection with the Loan, Lender's underwriting and closing due diligence with respect to the Loan, and the negotiation, documentation, and closing of the Loan (collectively, "*Transaction Costs*"), including (i) the fees, costs, and expenses of Lender's outside legal counsel; (ii) costs and expenses of UCC search reports and, if required by Lender, UCC insurance; (iii) recording and filing costs and expenses; (iv) transfer fees and taxes; and (v) costs and expenses of any required site inspections and inspection reports and other due

diligence investigations, including the fees of auditors, inspectors, or other consultants and advisers retained by Lender.

(c)    Processing Fee.  At or prior to Closing, Borrower agrees to pay to Lender a processing fee in the amount of $10,000 (the *"Processing Fee"*) to compensate Lender for Lender's internal processing costs.  The Processing Fee is in addition to the obligation of Borrower to pay Transaction Costs and is non-refundable.

(d)    Deposits.    Any deposits paid by Borrower to Lender prior to entering into this Agreement, whether on account of Transaction Costs or the Processing Fee, shall be applied at the Closing to the payment of Transaction Costs and the Processing Fee.  If the total amount of the deposits made by Borrower exceeds the Transaction Costs and Processing Fee, the excess shall be returned to Borrower at the time of Closing.

2.5    Conditions Precedent to Closing and Advances.

(a)    Conditions Precedent to Closing and Initial Advance.  The obligation of Lender to make the initial Advance of the Loan proceeds is subject to the satisfaction of each of the following conditions, in Lender's sole and absolute discretion, unless waived in writing by Lender:

(i)    Due Diligence.  Lender shall have completed such credit underwriting and due diligence with respect to the Borrower Parties, the Collateral, and the transaction as Lender deems appropriate, and the results of such underwriting and due diligence are satisfactory to Lender, in its sole discretion.

(ii)    Loan Documents.  Lender shall have received each of the Loan Documents, duly executed and, where appropriate, acknowledged, by all of the parties to such documents and in form and substance satisfactory to Lender, including this Agreement, the Note, the Guaranty, and all other documents required by Lender, duly executed and, where appropriate, acknowledged by the parties, including intercreditor agreements, landlord consents and subordination agreements.

(iii)    Financing Statement Filings.    Lender shall have received evidence that appropriate financing statements have been properly filed with the appropriate Governmental Authority and that the security interests of Lender in all personal property Collateral are in first lien position.

(iv)    Payment of Costs, Expenses and Fees.  All costs, expenses and fees to be paid by Borrower under the Loan Documents on or before the Closing will have been paid in full.

(v)    No Default; Representations.  No Default has occurred and is continuing or would occur as a result of the Loan being made on the Closing Date.  All representations and warranties of each of the Credit Parties in Loan Documents signed by such Credit Party are true, correct, and complete.

(vi)    Approval of Bankruptcy Court    Approval by a final order of the Loan pursuant to the Loan Documents by the Bankruptcy Court.

Upon fulfillment or waiver of all of the above conditions, this transaction shall close in accordance with the terms and conditions of this Agreement.

(b)    Conditions Precedent to Advances.  The obligation of Lender to make each Advance is subject to the satisfaction of each of the following conditions precedent, unless waived in writing by Lender in its sole and absolute discretion, and Lender shall fund each approved Advance within three Business Days after satisfaction of such conditions precedent:

Contract No.: _____
Asset Nos.: 056453 et al.

(i)     <u>Closing Conditions</u>. All of the conditions referred to in ***Section 2.5(a)*** shall have been satisfied.

(ii)     <u>Funding Cut-Off Date</u>. The Funding Cut-Off Date shall not have occurred.

(iii)     <u>No Default; Representations</u>. At the time of the request for the Advance and at the time the Advance is to be made, no Default shall have occurred and be continuing or would occur as a result of the making of such Advance. At the time of the request for the Advance and at the time the Advance is to be made, all representations and warranties of the Credit Parties in the Loan Documents are true, correct and complete.

(iv)     <u>Payment of Costs, Expenses and Fees</u>. All costs, expenses and fees to be paid by Borrower under the Loan Documents on or before the date of the Advance will have been paid in full.

(v)     <u>No Material Adverse Effect</u>. Lender shall have determined, in its sole judgment, that no Material Adverse Effect has occurred since the date of the prior Advance.

(vi)     <u>Other Requirements</u>. Borrower shall otherwise be in compliance with the requirements of this Agreement.

2.6     <u>Pricing and Payment Terms</u>.

(a)     <u>Interest Rate</u>. Interest shall accrue on the Loan Amount from Closing at a per annum rate equal to the Variable Rate for the Loan Term. Interest shall be computed on the basis of a 360-day year and actual days elapsed. Borrower agrees to pay an effective rate of interest that is the sum of the interest rate provided for in this Agreement, together with any additional rate of interest resulting from any other charges of interest or in the nature of interest paid or to be paid pursuant to any of the other Loan Documents.

(b)     <u>Payments</u>. Interest on the unpaid principal balance of the Loan shall accrue as set forth herein and shall be added to the principal balance of the Loan. Borrower shall pay the entire unpaid Loan Amount, all accrued and unpaid interest, and any other amounts payable under this Agreement and the other Loan Documents, if not earlier pre-paid, on the Maturity Date.

2.7     <u>Prepayments</u>. Borrower may prepay the Loan in full or in part at any time.

2.8     <u>Making Payments</u>.

(a)     <u>No Deductions</u>. All payments of principal and interest shall be made without deduction of any present and future Taxes, which amounts shall be paid by Borrower, and without any other right of abatement, reduction, setoff, defense, counterclaim, interruption, deferment or recoupment. Borrower will pay the amounts necessary such that the gross amount of the principal and interest received by Lender is not less than that required by the terms of this Agreement, the Note, and the other Loan Documents.

(b)     <u>Manner and Place of Payment</u>. Principal, interest, and all other amounts due to Lender from time to time under the Note, this Agreement, and the other Loan Documents (collectively, "***Payments***") shall be payable at 8377 East Hartford Drive, Suite 200, Scottsdale, Arizona 85255 or such other place as Lender may direct; ***provided, however***, that unless Lender otherwise advises Borrower in writing, all Payments shall be made by Automated Clearing House ("***ACH***") debit, and upon execution of this Agreement, Borrower shall authorize Lender to establish arrangements whereby all Payments are transferred by ACH debit initiated by Lender directly from an account at a U.S. bank in the name of Borrower to such account as Lender may designate from time to time. Payments not made by ACH debit, if permitted by Lender, shall be made by wire transfer of ready funds or by a check drawn on Borrower's bank account.

(c)     <u>Non-Conforming Payments</u>. Lender may, at its sole option, refuse any amount tendered by Borrower that is not in the required form or in the exact amount of the required Payment. UNAUTHORIZED FORMS OF PAYMENT, SUCH AS CASH, CASHIER'S CHECKS, OFFICIAL BANK CHECKS, TELLER'S CHECKS, CERTIFIED CHECKS, TRAVELERS' CHECKS, AND MONEY ORDERS, ARE <u>NOT</u> ACCEPTABLE FORMS OF PAYMENT AND WILL BE RETURNED TO BORROWER AT BORROWER'S RISK OF LOSS.

2.9     <u>Application of Proceeds</u>. All Payments, other than permitted principal prepayments, shall be applied first to the payment of costs and expenses of Lender, then to accrued and unpaid interest, and the balance to reduction of principal. Any permitted partial prepayment of principal shall be applied to principal in the inverse order of maturity, such that the scheduled monthly payment amounts otherwise calculated do not change. Any other provision of the Loan Documents to the contrary notwithstanding, during such time as an Event of Default has occurred and is continuing, all Payments shall be applied in such order and manner as Lender in its sole discretion may determine.

2.10     <u>Lender Computations</u>. Lender's computations, in accordance with the terms of this Agreement, of interest rates, Monthly Payment and final payment amounts, Prepayment Fees, and other amounts due and owing from Borrower to Lender shall be final and conclusive, absent manifest error.

2.11     <u>Maximum Lawful Rate of Interest</u>. With the intent to comply with any applicable usury laws, it is agreed that, any provisions in this Agreement, the Note, or any of the other Loan Documents to the contrary notwithstanding, in no event shall this Agreement, the Note, or any other Loan Document require the payment or permit the collection of interest or any amount in the nature of interest or fees in excess of the maximum amount permitted by applicable law. If any such excess interest is contracted for, charged or received pursuant to this Agreement, the Note, or any other Loan Document, so that the amount of such interest contracted for, charged or received shall exceed the maximum amount of interest permitted by applicable law, then in such event any such excess which may have been collected shall, at Lender's option, either be credited to the principal balance of the Loan as a prepayment of principal, without any Prepayment Fee, or refunded to Borrower, and the effective rate of interest shall automatically be reduced to the maximum lawful rate allowed under applicable law. Without limiting the foregoing, all calculations of the rate of interest contracted for, charged or received with respect to the Loan or under this Agreement, the Note, or any other Loan Document which are made for the purpose of determining whether such rate exceeds the maximum lawful contract rate, shall be made, to the fullest extent permitted by applicable law, by amortizing, prorating, allocating and spreading in equal parts during the period of the full stated term of the indebtedness, all interest at any time contracted for, charged to or received from Borrower in connection with such indebtedness; **_provided, however_**, that if any applicable state law is amended or the law of the United States of America preempts any applicable state law, so that it becomes lawful for Lender to receive a greater interest per annum rate than is presently allowed, Borrower agrees that, on the effective date of such amendment or preemption, as the case may be, the lawful maximum hereunder shall be increased to the maximum interest per annum rate allowed by the amended state law or the law of the United States of America.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Borrower acknowledges and agrees that (a) the representations and warranties in this Article are a material consideration to Lender; (b) Lender is relying on the correctness and completeness of all of these representations and warranties in entering into this transaction and making the Loan; and (c) these representations and warranties are true and accurate as of the date of this Agreement, will be true and accurate as of the Closing, as if made on the Closing Date, and will survive the Closing, regardless of any investigation or inspection by Lender. Accordingly, Borrower represents, warrants, and certifies to Lender that:

3.1     <u>Individual Borrowers</u>. With respect to each Borrower that is an individual: (a) such Borrower's exact legal name is as set forth on the signature page of this Agreement; (b) such Borrower has full legal capacity to enter into and perform such Borrower's obligations under the Loan Documents to which it is a party; (c) such Borrower's principal residence is at the location set forth on the signature page of this Agreement; and (d) the Loan

Documents to which such Borrower is a party have been duly authorized and validly executed and delivered by such Borrower.

3.2    _Entity Borrowers_.  With respect to each Borrower that is an entity:  (a) such Borrower's exact legal entity name is as set forth on the signature page of this Agreement; (b) such Borrower is validly existing and in good standing under the laws of the state of its formation and is duly qualified and licensed to do business in the state where the Site is located; (c) such Borrower has full power and authority to enter into and perform its obligations under the Loan Documents to which it is a party; (d) such Borrower has its chief executive office and principal place of business at the location set forth below its signature on the signature page of this Agreement; (e) the entry into and performance by such Borrower of the Loan Documents to which it is a party does not and will not conflict with or violate any provision of such Borrower's organizational documents; and (f) the Loan Documents have been duly authorized and validly executed and delivered by such Borrower.

3.3    _Performance; No Defaults_.  No Permits are required in connection with the authorization, execution, delivery, consummation, or performance by Borrower of the Loan Documents to which Borrower is a party (the "**_Borrower Loan Documents_**").  The authorization, execution, delivery, consummation, and performance by Borrower of the Borrower Loan Documents will not conflict with or violate any Applicable Law or result in any default (or any event, that with the giving of notice or the passage of time, or both, would constitute a default) under any Contractual Obligation.

3.4    _Binding Obligations_.  This Agreement and the other Borrower Loan Documents constitute the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally, and general principles of equity.

3.5    _Non-Foreign Status_.  Borrower is not a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate" or "foreign person," as those terms are defined by the Internal Revenue Code of 1986, as amended.

3.6    _Anti-Terrorism and Anti-Money Laundering_.  Neither Borrower nor any other Borrower Party is or shall be (a) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("**_OFAC_**"), Department of the Treasury, or any other similar lists maintained by OFAC or any other Governmental Authority pursuant to any authorizing statute, Executive Order or regulation; or (b) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation, or any other similar Executive Orders.  Borrower and each of the other Borrower Parties are in full compliance with all applicable provisions of the Bank Secrecy Act ("**_BSA_**") and of all other laws, regulations, and government guidance relating to the prevention and detection of money laundering violations or terrorist activities or threats.

3.7    _Title to Assets; Liens_.  Borrower has good, sufficient and legal title to all properties and assets reflected in its most recent balance sheet delivered to Lender, except for assets disposed of in the ordinary course of business since the date of such balance sheet.  Borrower is the owner of all of the Collateral free from any and all Liens, other than Permitted Liens.

3.8    _Leases_.  Borrower has delivered to Lender a true, correct and complete copy of the Lease pursuant to which the Site has been leased to Borrower.  The Lease is in full force and effect.  Borrower is the sole owner of the entire leasehold interest under the Lease, and Borrower's interest in the Lease has not been assigned, transferred, subleased, mortgaged, hypothecated or otherwise encumbered other than pursuant to Liens in favor of Lender.  No notice of default from the lessor under any Lease has been received by Borrower that has not been cured and no notice of default to any such lessor has been given that has not been cured.  The Lease is the only agreement between lessor and Borrower with respect to the Site.

3.9    _Full Disclosure_.  There is no fact known to Borrower or Guarantor that materially and adversely affects the business, operations, assets or condition (financial or otherwise) of Borrower or Guarantor that has not been disclosed in this Agreement, the Information, or in other documents, certificates and written statements furnished to Lender prior to the date of this Agreement.

3.10    Commercial Purpose of Loan. The purpose of the Loan is a commercial business purpose and not a personal, family, or household purpose. Borrower is borrowing the Loan and the Obligations, as they relate to the Loan Documents, are being incurred exclusively for commercial business purposes and not for any personal, family or household purpose. No portion of the Collateral is being used by Borrower or any other Person for any personal, family or household purposes.

## ARTICLE 4
## AFFIRMATIVE COVENANTS

From and after the Closing and until all Obligations are fully paid and performed, Borrower agrees that:

4.1    Organization and Status of Entity Borrower; Preservation of Name and Existence. For each Borrower that is an entity, such Borrower will continue to be validly existing and in good standing under the laws of its state of incorporation or formation and will continue to be qualified to do business as a foreign corporation, partnership or limited liability company in the state where the Site is located.

4.2    Use; Ownership. Borrower will (a) keep all of the tangible Collateral at the Site; (b) use the Collateral only in its trade or business; (c) maintain all of the tangible Collateral in good operating order and repair, normal wear and tear excepted; (d) use and maintain the Collateral only in compliance with manufacturers recommendations and all Applicable Laws; (e) keep all of the Collateral free and clear of any and all liens, claims and encumbrances, including purchase money security interests, other than those in favor of Lender; (f) own and keep at the Site all equipment, including all machinery, furniture, appliances, trade fixtures, tools, and office and record keeping equipment, and inventory, that are reasonably necessary for the proper and prudent operation of the Site as a Permitted Concept; and (g) except as otherwise provided in this Agreement, remain the sole owner of the Collateral.

4.3    Insurance.

(a)    Required Coverage. Borrower will maintain, at its sole expense, the following insurance:

(i)    Property insurance, with special causes of loss/all risk coverage, insuring against loss, damage or destruction by fire and other casualty, including theft, vandalism and malicious mischief, plate glass breakage, sprinkler damage (if the Site has a sprinkler system), and such other risks as Lender may reasonably require, insuring the Collateral for not less than 100% of its full insurable replacement cost, with Lender named as loss payee.

(ii)    Commercial general liability insurance against claims for personal injury, bodily injury or death, and property damage or destruction occurring in, on or around the Site in amounts not less than $1,000,000 per occurrence, with an aggregate not less than $2,000,000 per location. If general liability coverage is not per location, or if the named insured operates five or more locations, excess liability or umbrella liability policy in an amount not less than $5,000,000 is required. Lender shall be named as an additional insured on each such policy. Such insurance shall include broad form contractual liability coverage (including for Borrower's indemnity obligations under the Loan Documents), products liability coverage, and liquor liability coverage, providing coverage against liability arising from the sale of liquor, beer or wine on the Site, if such sales are to occur.

(iii)    Business income insurance, covering risk of loss due to the occurrence of any hazard insured against under the "all risk" coverage insurance and providing coverage in an amount sufficient to permit the payments of principal and interest due under the Note, taxes, insurance and operating expenses for a period of not less than 12 months, with Lender named as a loss payee on each such policy.

(iv)     Worker's compensation insurance in the statutorily mandated limits and employer's liability insurance with limits not less than $500,000 or such greater amount as Lender may from time to time require.

(v)     Such other insurance and coverages as may be necessary to comply with all Applicable Law or as is usual and customary for businesses of the type and in the location as the Site or as Lender may otherwise require in the exercise of its reasonable discretion.

(b)     Policy Requirements.  All insurance policies shall:  (i) provide for a waiver of subrogation by the insurer as to claims against Lender, its employees and agents and provide that such insurance cannot be unreasonably cancelled, invalidated or suspended on account of the conduct of Borrower, its officers, directors, employees or agents; (ii) be written on an "occurrence" basis and provide that all insurance required to be carried by Borrower is primary, with deductibles not to exceed $10,000, that any "no other insurance" clause in any insurance policy required to be carried by Borrower excludes any policies of insurance maintained by Lender, and that all such insurance policies will not be brought into contribution with insurance maintained by Lender; (iii) contain a standard without contribution loss payee clause endorsement in favor of Lender and its successors and assigns as their interests may appear; (iv) include an agreement by the insurer that any loss will be payable in accordance with the terms of the policy notwithstanding any act or neglect of Borrower, anyone acting for Borrower or any tenant or other occupant of the Site; (v) provide that the policy of insurance shall not be terminated, cancelled or substantially modified without at least 30 days' prior written notice to Lender; (vi) be issued by insurance companies licensed to do business in the state in which the Site is located and which are rated A:VIII or better by Best's Key Rating Guide or otherwise approved by Lender; and (vii) be written for a period of at least one year.

(c)     Evidence of Insurance.  Prior to the Closing, Borrower shall have delivered to Lender all required policies of insurance or certificates of insurance evidencing that such insurance is in full force and effect and satisfies the requirements set forth in this Agreement.  At least 30 days prior to the expiration of each such policy, Borrower shall furnish Lender written evidence that such policy has been renewed or replaced by delivering to Lender a copy of the replacement policy or an insurance company certificate reciting that there is in full force and effect insurance of the types and in the amounts required by this Agreement.

(d)     No Release.  The foregoing insurance requirements, including minimum limits of insurance coverage, shall not limit the liability of Borrower for its acts or omissions as provided in this Agreement or in any of the other Loan Documents.

(e)     Exercise of Remedies.  If there is a sale of the Collateral or any other transfer of title or assignment of the Collateral in extinguishment, in whole or in part, of the Obligations, all right, title and interest of Borrower in and to all required policies of insurance relating to the Collateral so transferred shall inure to the benefit of and pass to the successor in interest to Borrower or the purchaser or grantee of the Collateral, to the extent such policies are assignable pursuant to the terms thereof.

4.4     Casualty.

(a)     Casualty; Continuation of Obligations.  Borrower shall at all times bear the entire risk of any loss, theft, damage to, or destruction of, any of the Collateral from any cause whatsoever (a "*Casualty*").  If a Casualty occurs, whether or not covered by insurance, Borrower will promptly give Lender written notice of the Casualty, generally describing the nature and extent of the Casualty.  No Casualty shall relieve Borrower of any of its Obligations, including its obligations to make the regularly scheduled payments of principal and interest under this Agreement.

(b)     Restoration Obligation.  Promptly following the occurrence of a Casualty, Borrower shall, at Borrower's expense, commence and diligently complete the repair, restoration, replacement and rebuilding of the Collateral as nearly as possible to its value, condition and character immediately prior to the Casualty (a "*Restoration*").  Borrower shall not be excused from repairing or maintaining the Collateral

or from Borrower's Restoration obligation, regardless of whether there are Insurance Proceeds available to Borrower or whether any such Insurance Proceeds are sufficient in amount, and the application or release by Lender of any Insurance Proceeds shall not cure or waive any default or notice of default under this Agreement or the other Loan Documents or invalidate any act done pursuant to such default or notice of default.

(c)   Application of Insurance Proceeds.  All proceeds of insurance with respect to any Casualty (the "*Insurance Proceeds*") shall be payable to Lender, and Borrower authorizes and directs any affected insurance company to make payment of the Insurance Proceeds directly to Lender.  If Borrower receives any Insurance Proceeds relating to such Casualty, Borrower shall promptly pay over such proceeds to Lender.  All Insurance Proceeds shall be applied by Lender to payment of the Obligations in such order as Lender shall determine; *provided, however,* that if no Default has occurred and is continuing, the Insurance Proceeds, less the costs, fees and expenses incurred by Lender and Borrower in the collection thereof, including adjuster's fees and expenses and reasonable attorneys' fees and expenses (the "*Net Insurance Proceeds*"), shall be made available to Borrower as follows:

(i)   If the Net Insurance Proceeds are less than $25,000, the Net Insurance Proceeds shall be paid to Borrower and applied by Borrower toward the cost of the Restoration; and

(ii)   If Net Insurance Proceeds are $25,000 or greater, then the Net Insurance Proceeds shall be held and disbursed by Lender, or as Lender may from time to time direct, as the Restoration progresses, to pay or reimburse Borrower for the cost of the Restoration, upon written request of Borrower accompanied by evidence, reasonably satisfactory to Lender, that:  (A) the Restoration is in compliance with all Applicable Law and all private restrictions and requirements; (B) the amount requested has been paid or is then due and payable and is properly a part of such cost; (C) if the estimated cost of the Restoration exceeds the Net Insurance Proceeds (exclusive of proceeds received from Borrower's business income insurance), Borrower has deposited into an escrow satisfactory to Lender such excess amount, which sum will be disbursed pursuant to escrow instructions satisfactory to Lender; and (D) the balance of such Net Insurance Proceeds, together with the funds deposited into escrow, if any, pursuant to the preceding subsection, after making the payment requested, will be sufficient to pay the balance of the cost of the Restoration.  Upon receipt by Lender of evidence reasonably satisfactory to it that the Restoration has been completed and the cost thereof paid in full, the balance, if any, of such Net Insurance Proceeds shall be paid to Borrower.

4.5   Representations and Warranties.  Borrower will do all things necessary or appropriate such that the representations and warranties of Borrower and the other Credit Parties contained in any of the Loan Documents remain true, complete, and correct.

4.6   Operations.  Except as otherwise provided in this Section and except as otherwise provided with respect to casualty, Borrower shall at all times occupy the Site and diligently operate its business at the Site. Borrower may cease business operations at the Site for a period not to exceed 90 days and may do so only once within any 5-year period while the Obligations are outstanding.  If Borrower discontinues operations as permitted by this Section, Borrower shall: (a) give written notice to Lender at least 10 days prior to the date Borrower ceases operation; (b) provide adequate protection and maintenance of the Site and other Collateral during any period of vacancy; and (c) pay all costs necessary to restore the Site and other Collateral to its condition on the day operations ceased, such that Borrower can resume operations.  Borrower shall not, and shall not permit any tenant to, by itself or through any lease or other type of transfer, convert the Site or the other Collateral to an alternative use while this Agreement is in effect without Lender's consent, which consent shall not be unreasonably withheld or conditioned. Lender may consider any or all of the following in determining whether to grant its consent, without being deemed to be unreasonable:  whether the converted use will be consistent with the highest and best use of the site and the other Collateral and whether the converted use will increase Lender's risks or decrease the value of the Site or the other Collateral.

4.7   Compliance; Licenses and Permits.  Borrower will comply with all Applicable Law, except for such non-compliance, from time to time, as could not reasonably be expected to have a Material Adverse Effect.

Borrower will obtain and maintain in full force and effect at all times all Permits that are required to use and operate the Site as a Permitted Concept.

4.8    Taxes.  Except for amounts being contested as permitted in this Agreement, for taxes arising after the filing of the Bankruptcy Cases, Borrower will pay and discharge before delinquency all Taxes imposed upon it, its income or profits, or any property belonging to it, including the Collateral;

4.9    Books and Records.  Borrower will keep proper Books and Records, in which full, true and correct entries shall be made in accordance with GAAP and all other Applicable Law of all financial transactions and the assets and business of Borrower.

4.10    Inspections.  Borrower and each other Credit Party shall, during normal business hours and upon reasonable advance notice (unless a Default shall have occurred and be continuing, in which event no notice shall be required and Lender shall have access at any and all times), (a) provide access to each property owned, leased, or controlled by Borrower or such other Credit Party to Lender and any of its Related Persons, as frequently as Lender determines to be appropriate; (b) permit Lender and any of its Related Persons to inspect, audit and make extracts and copies (or take originals if reasonably necessary) from all of Borrower's and such Credit Party's Books and Records; and (c) permit Lender and any of its Related Persons to inspect, review, evaluate and make physical verifications and appraisals of the Collateral in any manner and through any medium that Lender considers advisable, and, in each such case, Borrower and each other Credit Party agrees to render to Lender, at Borrower's cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto.

4.11    Notices of Litigation.  Borrower will give prompt written notice to Lender of any of the following of which Borrower has knowledge: (a) any action or proceeding instituted by or against it in any court or before any commission or other regulatory body (federal, state, local, or foreign) or any such proceeding which is threatened against it; (b) any other action, event or condition of any nature which could reasonably be expected to have a Material Adverse Effect, or which, with notice or lapse of time or both, would constitute an event of default or a default under any other instrument or agreement to which it is a party or by or to which it or any of its assets may be bound or subject; and (c) the occurrence of any Default (and the action Borrower proposes to take with respect thereto).

4.12    Anti-Terrorism and Anti-Money Laundering Provisions.  Borrower shall not take any action or engage in any activity of any nature whatsoever, and will use its best efforts to ensure that no other Borrower Party takes any such action or engage in any such activity that would or could result in Borrower or such other Borrower Party being (a) listed on the Specially Designated Nationals and Blocked Person List maintained by OFAC or any other similar lists maintained by OFAC or any other Governmental Authority pursuant to any authorizing statute, Executive Order or regulation; or (b) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation, or any other similar Executive Orders.  Borrower shall comply with, and will use its best efforts to ensure that each of the other Borrower Parties complies with, the applicable provisions of the BSA and all other laws, regulations, and government guidance relating to the prevention and detection of money laundering violations or terrorist activities or threats.

## ARTICLE 5
## NEGATIVE COVENANTS

From and after the Closing and until all of the Obligations are fully paid and performed, Borrower shall NOT, directly or indirectly, by operation of law, or otherwise:

5.1    Modification of Organizational Documents; Changes Affecting Entities.  With respect to each Borrower that is an entity, (a) amend, restate, supplement, or terminate its organizational documents in any manner that could reasonably be expected to have a Material Adverse Effect or (b) change any of the following from what it is as of the Closing Date:  (i) its name; (ii) its place of business or, if there is more than one principal place of business, its chief executive office; (iii) its mailing address; (iv) the location of the Collateral or its records concerning the Collateral; (v) the type of legal entity that it is; (vi) the organization identification number issued by

its state of incorporation or organization, if it has one, or, if Borrower does not have an organizational identification number and later obtains one, Borrower will immediately notify Lender of such organizational identification number; or (vii) its state of incorporation or organization, without such Person, in each instance, giving at least 45 days' prior written notice thereof to Lender and taking all actions deemed necessary or appropriate by Lender to continuously protect and perfect Lender's Liens upon the Collateral.

5.2    Changes Affecting Individuals.  With respect to each Borrower that is an individual, change any of the following from what it is as of the Closing Date: (a) its name; (b) its principal residence; or (c) the location of the Collateral or its records concerning the Collateral, without, in each instance, giving at least 60 days prior written notice thereof to Lender and taking all actions deemed necessary or appropriate by Lender to continuously protect and perfect Lender's Liens in the Collateral.

5.3    Accounting Changes.  Change its accounting treatment or reporting practices, except as required by GAAP or any Applicable Law, or change its fiscal year from that currently in effect.

5.4    Fundamental Changes.  Dissolve or liquidate, or become a party to any merger or consolidation, or acquire by purchase, lease or otherwise, all or substantially all of the assets or capital stock of any Person; *provided, however*, that the foregoing shall not operate to prevent a transaction otherwise prohibited pursuant to this Section but that results in the Obligations being paid and performed in full; nor will Borrower make any changes in any of its business objectives, purposes, or operations that could reasonably be expected to adversely affect repayment of the Obligations or could reasonably be expected to have a Material Adverse Effect, or engage in any business other than that presently engaged in on the Closing Date.

5.5    Liens.  Incur, maintain or otherwise suffer to exist any Lien upon or with respect to any of the Collateral except for (a) Liens in favor of Lender; and (b) the existing lien on the Site at 120 South Riverside Plaza, Chicago, in favor of the SBA securing a loan for approximately $1,200,000.00 to Boston Blackies of Riverside Plaza, Inc. ("*Permitted Liens*").

5.6    Covenant Against Indebtedness.  Create, permit to be created or incur any Indebtedness, other than (a) the Obligations, (b) trade debt incurred and paid in the ordinary course of business and in any event within 60 days after incurrence; (c) the Subordinated Debt, and (b) the existing indebtedness incurred from Boston Blackies of Riverside Plaza, Inc. in favor of the SBA for approximately $1,200,000.00 with respect to the Site at 120 South Riverside Plaza, Chicago, IL (the "*Permitted Indebtedness*").

5.7    Lease.  Agree to any amendment to the Lease that could reasonably be expected to have a Material Adverse Effect or assign, transfer, mortgage, pledge or hypothecate the Lease or any interest therein to any party other than Lender, in any case without Lender's prior written consent, in Lender's sole and absolute discretion.

5.8    Assignments by Borrower; Prohibited Transactions; Fees.  Without first obtaining the written consent of Lender, in Lender's sole and absolute discretion, do any of the following:  (a) sell, transfer, convey, hypothecate, encumber, or lease any of the Collateral to any Person, voluntarily or involuntarily, by operation of law, or otherwise; (b) assign, transfer, convey, hypothecate, or encumber its interest in this Agreement or the other Loan Documents, voluntarily or involuntarily, by operation of law or otherwise; (c) engage in or allow a Change of Control to occur; (d) pledge, encumber, hypothecate or assign any interest in Borrower as collateral for any obligation of Borrower or any other Person; or (e) enter into any agreement to do, or which would or could result in, any of the foregoing, Borrower acknowledging that Lender has relied both on the business experience and creditworthiness of Borrower and upon the particular purposes for which Borrower intends to use the Site in entering into this Agreement.  In connection with any request for consent, Borrower agrees to pay Lender a fee equal to **one percent** of the then outstanding principal balance of the Note and also to pay to Lender all such other amounts as may be due to Lender in connection therewith, as provided for in *Section 9.4*.

5.9    Collateral Transfers.  Sell, lease, mortgage, hypothecate, license, grant a security interest in or otherwise transfer or encumber any of the Collateral (a "*Transfer*") except for (a) sales of inventory in the ordinary course of business; and (b) so long as no Default has occurred and is continuing, sales or other dispositions of obsolescent items of equipment consistent with past practices, so long as such items of obsolete equipment are

replaced by items of equal or greater value and utility. Except as provided in the preceding sentence, Borrower will not part with possession of any of the Collateral, except to Lender or for maintenance and repair.

5.10    Affiliate Transactions.  Enter into any transactions between or among Borrower and any of the other Borrower Parties unless the same are on terms substantially as advantageous to Borrower as those which could be obtained by Borrower in a comparable arm's length transaction with an independent third party.

5.11    Equity Distributions.  Make any dividend or distribution for or on account of equity interests in Borrower if either before or after giving effect to such dividend or distribution a Default or Event of Default would occur or has occurred and is continuing.

5.12    Restrictions on Use of Loan Proceeds.  Use any of the Loan proceeds or the Collateral for personal, family, or household purposes, Borrower further agreeing that the proceeds of the Loan will be used exclusively in Borrower's business and that any breach of the covenants in this Section shall be an immediate Event of Default.


### ARTICLE 6
### SECURITY AGREEMENT

6.1    Grant of Security Interest.  Borrower grants to Lender a security interest in all of the Collateral.

6.2    Obligations Secured.  This security interest is given to secure the payment and performance of the Obligations, including all indebtedness under this Agreement and the other Loan Documents.

6.3    Financing Statements and Further Assurances.  Borrower agrees, on request of Lender, to furnish to Lender such further information, to execute and deliver to Lender such documents and instruments (including UCC financing statements) and to do such other acts and things as Lender may at any time reasonably request relating to the perfection or protection of the security interest in the Collateral created by this Agreement or for the purpose of carrying out the intent of this Agreement. Without limiting the foregoing, Borrower shall cooperate and do all acts deemed necessary or advisable by Lender to continue in Lender a perfected first security interest in the Collateral and shall obtain and furnish to Lender any subordinations, releases, landlord, lessor, bailee or mortgagee waivers, control agreements, and similar documents as may be from time to time requested by, and in form and substance satisfactory to, Lender. Borrower will warrant and defend the Collateral and Lender against all claims by all persons in connection with the Obligations.

6.4    Lender's Authority.  Borrower authorizes Lender to file financing statements, continuations, and amendments thereto describing the Collateral and containing any other information required by the applicable UCC, in such form and substance as Lender, in its sole discretion, may determine. Borrower irrevocably grants to Lender the power to sign Borrower's name and generally to act on behalf of Borrower to execute and file applications for title, transfers of title, financing statements, notices of lien, demands for terminations or other security interests in any of the Collateral and other documents pertaining to any or all of the Collateral. This power is coupled with Lender's interest in the Collateral and is irrevocable during such time as any of the Obligations are outstanding. Borrower shall, if any certificate of title be required or permitted by law for any of the Collateral, obtain and promptly deliver to Lender such certificate showing the lien of this Agreement with respect to the Collateral. Borrower ratifies its prior authorization for Lender to file financing statements and amendments thereto describing the Collateral and containing any other information required by the UCC, if filed prior to the date hereof.

6.5    Certain Rights and Remedies.  If an Event of Default shall have occurred and be continuing, Lender, without any other notice to or demand upon Borrower, shall have in any jurisdiction in which enforcement of this Agreement is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC and any additional rights and remedies that may be provided to a secured party in any jurisdiction in which any of the Collateral is located, including the right to take possession of the Collateral, and for that purpose Lender may, so far as Borrower can give authority therefor, enter upon the Site and remove the same therefrom. Lender may in its discretion require Borrower to assemble all or any part of the Collateral at such location or

locations as Lender may reasonably designate. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give to Borrower at least five Business Days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. Borrower acknowledges that 10 calendar days prior written notice of such private sale or sales shall be reasonable notice. In addition, Borrower waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Lender's rights and remedies hereunder, including, without limitation, its right following an Event of Default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

6.6    <u>Proceeds of Dispositions; Expenses</u>. Borrower shall pay to Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Lender in protecting, preserving or enforcing Lender's rights and remedies under or in respect of any of the Obligations or any of the Collateral. After deducting all of the foregoing expenses, the residue of any proceeds of collection or sale or other disposition of the Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference as Lender may determine. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the UCC, any excess shall be returned to Borrower. In the absence of final payment and satisfaction in full of all of the Obligations, Borrower shall remain liable for any deficiency.

<div align="center">

**ARTICLE 7**
**DEFAULT AND REMEDIES**

</div>

7.1    <u>Defaults</u>. The following constitute events of default (each, an "***Event of Default***"):

(a)    <u>Monetary Events of Default</u>. If any Obligation for the payment of money is not paid on or before the due date therefor (or if no specific due date is specified, then within 10 days of written demand from Lender) and such failure continues without being fully cured within 10 days following written notice to Borrower of such failure.

(b)    <u>Misrepresentations</u>. If any representation or warranty of Borrower or any other Credit Party contained in any of the Loan Documents was untrue or incorrect in any material respect when made or deemed made, or if Borrower or any other Credit Party renders any statement or account which is untrue, incorrect, or incomplete in any material respect.

(c)    <u>Certain Covenant Breaches</u>. If Borrower (i) shall fail to maintain insurance in accordance with the requirements of this Agreement or any of the other Loan Documents; (ii) is not in compliance with any financial covenant contained in ***Article 4;*** or (iii) breaches any of the covenants contained in ***Article 5***.

(d)    <u>Non-Monetary Events of Default</u>. If Borrower fails to observe or perform any of the covenants, conditions, or obligations of this Agreement or any of the other Loan Documents other than those referred to in the other subsections of this ***Section 7.1*** and such failure continues without being fully cured for more than 20 days following written notice to Borrower of such failure. However, if any such failure is not willful or intentional, does not place any rights or interest in any Collateral in immediate jeopardy, and is within the reasonable power of Borrower to promptly cure after receipt of notice thereof, all as determined by Lender in its reasonable discretion, then such failure shall not constitute an Event of Default (unless otherwise expressly provided) if during such 20-day period, Borrower begins to cure the failure and then diligently pursues the cure to completion, except that in no event will the cure period under this subsection exceed 60 days from the date Borrower receives the notice from Lender. If Borrower fails to cure such failure within the time periods provided in this subsection, an Event of Default shall be deemed to have occurred without further notice or demand of any kind being required.

(e)    <u>Material Adverse Effect</u>. The occurrence of any event that has had or could reasonably be expected to have a Material Adverse Effect.

(f)    <u>Litigation</u>.  A final judgment or judgments for the payment of money shall be rendered against Borrower or any other Borrower Party, unless (i) the same shall be (A) fully covered by insurance and the issuer(s) of the applicable policies shall have acknowledged full coverage in writing within 30 days of judgment; or (B) vacated, stayed, bonded, paid or discharged within a period of 45 days from the date of such judgment; or (ii) payment of such money judgment would not have a Material Adverse Effect.

(g)    <u>Dissolution</u>.  Borrower or any other Credit Party that is an entity is dissolved or its existence as an entity is terminated or there is commenced against Borrower or any such Credit Party any action or proceeding which seeks as one of its remedies the dissolution of Borrower or such Credit Party or termination of its existence.

(h)    <u>Other Defaults</u>.  (i) If there is a default under any of the other Loan Documents or with respect to any Related Agreement that is not cured within any applicable notice or cure period; (ii) if a default occurs in the payment or performance when due (after giving effect to any applicable notice and grace periods), whether by acceleration or otherwise, of: (A) any Indebtedness of Borrower or any other Borrower Party; or (B) any other material Contractual Obligation of Borrower or any other Borrower Party; (iii) there is a default which remains uncured after expiration of any applicable cure period under the Lease; or (iv) the Lease terminates or expires prior to the performance and payment in full of all Obligations.

(i)    <u>Invalidity of Loan Documents</u>.  Any provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms, or any Lien granted, or intended by the Loan Documents to be granted, to Lender shall cease to be a valid and perfected Lien having the first priority (or a lesser priority if expressly permitted in the Loan Documents) in any of the Collateral (or Borrower or any other Borrower Party shall so assert any of the foregoing).

(j)    <u>Other Events of Default</u>.  Any other event or circumstance designated elsewhere in this Agreement or any of the other Loan Documents as an Event of Default.

7.2    <u>Remedies</u>.  Upon the occurrence and during the continuance of an Event of Default, Lender may declare all or any part of the Obligations to be due and payable without presentment, demand, protest or further notice of any kind.  Borrower waives notice of intent to accelerate the Obligations and notice of acceleration.  In addition to declaring the Obligations due and payable, Lender may exercise, at its option, concurrently, successively or in any combination, all rights and remedies now or in the future available under any of the Loan Documents or at law or in equity, and none of such rights or remedies are exclusive.  Neither the acceptance of this Agreement nor its enforcement shall prejudice or in any manner affect Lender's rights to realize upon or enforce its rights with respect to any security now or in the future held by Lender, and Lender is entitled to enforce this Agreement and its rights and remedies with respect to any such security in such order and manner as it may in its absolute discretion determine.  No delay or omission on the part of Lender in exercising any remedy, right or option shall operate as a waiver of such remedy, right or option.  In any event, a waiver on any one occasion shall not be construed as a waiver or bar to any such remedy, right or option on a future occasion.  No remedy will be exercise without relief from the automatic stay.

7.3    <u>Full Payment Required</u>.  The acceptance by Lender of any sum after the same is due shall not constitute a waiver of the right either to require prompt payment, when due, of all other sums hereby secured or to declare a subsequent Event of Default as herein provided.  The acceptance by Lender of any sum in an amount less than the sum then due shall be deemed an acceptance on account only and upon condition that it shall not constitute a waiver of the obligation of Borrower to pay the entire sum then due, and failure of Borrower to pay such entire sum then due shall, at the election of Lender, constitute an immediate Event of Default without the necessity for any further notice, notwithstanding such acceptance of such amount on account.  Consent by Lender to any action or inaction of Borrower which is subject to consent or approval of Lender under this Agreement or any of the other Loan Documents shall not be deemed a waiver of the right to require such consent or approval to future or successive actions or inactions.

7.4    <u>Lender's Right to Cure</u>.  Lender may, at its option and without any obligation to do so, pay, perform, and discharge any and all amounts, costs, expenses and liabilities that are Borrower's responsibility under any of the Loan Documents if Borrower fails to timely pay, perform or discharge the same after 10 days prior

written notice to Borrower of Lender's intent to take any such action, and all amounts reasonably expended by Lender in so doing shall become part of the Obligations, secured by the Liens in favor of Lender created in accordance with this Agreement, and shall be immediately due and payable by Borrower to Lender on demand.

7.5     Default Interest.  Any amounts not paid to Lender when due (including amounts due by reason of acceleration) shall bear interest from the due date until paid, at a rate per annum equal to the Default Rate, and such Default Rate shall continue to apply following a judgment in favor of Lender. The application of such Default Rate shall not be interpreted or deemed to extend any cure period set forth in this Agreement or any other Loan Document or cure any default or otherwise limit any of Lender's rights or remedies under this Agreement or any other Loan Documents.

7.6     Late Fees.  If Lender does not receive from Borrower payment in full of any scheduled or other payment on or before the 5th day after the due date, then Borrower shall pay to Lender, in addition to any other sum due Lender under the Note or any other Loan Document, a late fee (the "*Late Fee*") equal to the lesser of (a) 5% of such past-due payment or installment and (b) the lawful maximum, if any, which Late Fee Borrower agrees is a reasonable estimate of the loss that may be sustained by Lender due to the failure of Borrower to make timely payments.

## ARTICLE 8
## LENDER ASSIGNMENTS; CROSS-COLLATERALIZATION

8.1     Right to Assign; Lender Transfers.  Lender, from time to time, may assign, sell, or transfer in whole or in part its interests in the Note, the Loan, or any of its rights under any of the Loan Documents, including servicing rights, whether as part of a securitization transaction or by participation, assignment, sale or other transfer (in each case, a "*Lender Transfer*"). Upon a Lender Transfer of Lender's entire right and interest under the Loan Documents, Lender shall automatically be relieved, from and after the date of such assignment, of liability for the performance of any obligation of Lender contained in the Loan Documents.

8.2     Releases.  From time to time, Borrower may make written requests for releases or substitutions of Collateral, which requests shall be accompanied by such detailed information as Lender may require in order to make an informed decision. Lender will consider each such request in good faith; however, Lender may refuse any such request in Lender's sole and absolute discretion.

## ARTICLE 9
## GENERAL PROVISIONS

9.1     Applicability of General Provisions.  The provisions of this *Article 9* and of *Article 1* apply equally to this Agreement and to each of the other Loan Documents, the same as if the provisions of this Article were set forth in full in each of the other Loan Documents.

9.2     Modification of Agreement; Waivers.  None of the terms and provisions of this Agreement or the other Loan Documents may be amended, extended, renewed, terminated, or supplemented nor shall Lender have waived any of its rights under any of the Loan Documents, unless Borrower and the other Credit Parties obtain the prior written consent of Lender with respect to any such matter, which consent may be withheld or conditioned in the sole and absolute discretion of Lender, unless otherwise expressly provided in the Loan Documents. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.

9.3     Binding Effect.  This Agreement and the other Loan Documents shall become effective when executed by Borrower, the other Credit Parties, and Lender. Thereafter, the Loan Documents shall be binding upon and inure to the benefit of Borrower, each other Credit Party, Lender and, to the extent provided in *Section 9.7*, each of the other Lender Parties, and, in each case, their respective heirs, executors, representatives, successors and permitted assigns.

9.4   <u>Brokers</u>.  Borrower represents and warrants to and covenants with Lender that neither Borrower nor any other Borrower Party has dealt with any broker, agent, finder or other intermediary in connection with the transactions contemplated by this Agreement and the other Loan Documents.   Borrower understands and acknowledges that, Lender through its normal marketing and business development activities, encourages brokers (acting as agents for borrowers) to bring potential transactions to Lender for evaluation; that in doing so, Lender may provide brokers with business entertainment, trips, merchandise or other incentives or benefits (*"Broker Incentives"*); and that such Broker Incentives may be treated as part of Lender's general business expenses and, along with other types of expenses, may be taken into account by Lender from time to time in establishing fees, pricing or other terms and conditions of its lending transactions.

9.5   <u>Costs and Expenses</u>.  Any action taken by Borrower or any other Borrower Party with respect to any Loan Document, even if required under any Loan Document or at Lender's request, shall be at Borrower or such other Borrower Party's expense, and Lender shall not be required to reimburse Borrower or any other Borrower Party therefor.  In addition, Borrower agrees to pay Lender, or reimburse Lender within 10 days of written demand therefor, all reasonable out-of-pocket costs and expenses, including reasonable costs and expenses for legal counsel, incurred by Lender or any of its Related Persons in connection with the following:   (a) the investigation, interpretation or administration of any of the Loan Documents; (b) the investigation, development, preparation, negotiation, execution, interpretation or administration of (i) any amendment, extension, renewal, termination, supplement, or waiver of any provision of any Loan Document; (ii) any commitment or proposal letter for any such modification or termination; (iii) any other document prepared in connection with any such modification or termination; (iv) any release or substitution of Collateral; (v) any request for Lender consent or approval to any matter; or (vi) the consummation and administration of any transaction contemplated in such modification or termination (including periodic audits in connection therewith); (c) internal audit reviews, field examinations, and Collateral examinations, provided that unless an Event of Default has occurred and is continuing, Borrower shall not be responsible for the cost of such reviews or examinations more than one time in a calendar year; (d) any refinancing or restructuring of the credit arrangements provided pursuant to the Loan Documents in the nature of a "work-out"; (e) the enforcement or preservation of any right or remedy under any Loan Document, any other Obligation, with respect to the Collateral, or with respect to any other related right or remedy; and (f) the commencement, defense, conduct of, intervention in, or the taking of any other action with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to Borrower, any other Borrower Party, any Loan Document, or any Obligation (or the response to and preparation for any subpoena or request for document production relating thereto).   In addition to the foregoing, Borrower also agrees to pay to Lender a reasonable processing and review fee in connection with the matters described above.  The obligations of Borrower in this Section are in addition to the obligations to pay the amounts described in *Article 2*.

9.6   <u>Indemnities</u>.  Borrower agrees to indemnify, hold harmless and defend Lender and the other Lender Parties for, from and against all Liabilities that may be imposed on, incurred by or asserted against any such Lender Party in any matter relating to or arising out of, in connection with, or as a result of any of the following: (a) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan or any securities filing of, or with respect to, Borrower or any other Borrower Party; (b) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of Borrower or any other Borrower Party in connection with any of the foregoing; (c) Borrower's operations at or in any manner relating to the Site; (d) the Collateral, whether relating to its original design or construction, latent defects, operation, alteration, maintenance, or use by Borrower, its employees, agents, contractors, invitees, or licensees; (e) any disclosures of any of the Credit Party Information (defined below) made pursuant to the authorizations provided in this Agreement; (f) any misrepresentation or inaccuracy in any representation or warranty in any of the Loan Documents; (g) any breach or failure by Borrower or any other Credit Party to perform its respective obligations under the Loan Documents; (h) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Lender Party, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such Lender Party, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Applicable Law or theory thereof, including common law, equity, contract, tort or otherwise; or (i) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the *"Indemnified Matters"*); *provided, however,* that Borrower shall not have any liability under this Section to any Lender Party with respect to any Indemnified Matter to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such Lender Party, as determined by a

court of competent jurisdiction in a final non-appealable judgment or order, nor shall any Lender Party have any liability with respect to any Indemnified Matter as to which such Lender Party would otherwise be liable, except to the extent such liability has resulted primarily from the gross negligence or willful misconduct of such Lender Party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, Borrower and each other Credit Party executing any Loan Document waive and agree not to assert against any Lender Party, and shall cause each other Credit Party to waive and not assert against any Lender Party, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Lender Party.

   9.7    Survival.  Any indemnification or other protection provided to any Lender Party pursuant to any Loan Document and all representations and warranties made in any Loan Document shall survive the repayment in full in cash and performance of the Obligations and inure to the benefit of any Person that at any time held a right thereunder (as a Lender Party or otherwise) and, thereafter, its successors and permitted assigns.

   9.8    Limitation of Liability for Certain Damages.  In no event shall any Lender Party be liable to Borrower or any other Borrower Party on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  **BORROWER AND EACH OTHER CREDIT PARTY HEREBY WAIVE, RELEASE AND AGREE NOT TO SUE UPON (AND BORROWER SHALL CAUSE EACH OF THE OTHER BORROWER PARTIES TO SO WAIVE, RELEASE, AND AGREE NOT TO SUE UPON) ANY SUCH CLAIM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.**

   9.9    Lender-Creditor Relationship.  The relationship between Lender, on the one hand, and the Borrower Parties, on the other hand, is solely that of lender and creditor.  Lender has no fiduciary relationship or duty to Borrower or any other Borrower Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between Lender and any of the Borrower Parties by virtue of, any Loan Document or any transaction contemplated therein.  None of the Loan Document provisions is intended, nor shall be deemed or construed, to make Lender in any way responsible for the debts, obligations or losses of Borrower or any other Borrower Party.  **BORROWER ACKNOWLEDGES, CONFIRMS AND AGREES THAT LENDER HAS NOT ACTED AS AN INVESTMENT, TAX OR FINANCIAL ADVISER TO BORROWER OR ANY OTHER BORROWER PARTY IN ANY RESPECT AND HAS NOT OTHERWISE PROVIDED BORROWER OR ANY OTHER BORROWER PARTY WITH ANY INVESTMENT, TAX, OR FINANCIAL ADVICE OF ANY NATURE WHATSOEVER.**

   9.10    Marshalling; Payments Set Aside.  Lender shall have no obligation to marshal any property in favor of Borrower or any other Borrower Party or any other party or against or in payment of any Obligation.  To the extent that Lender receives a payment from Borrower or any other Borrower Party pursuant to any Loan Document, from the proceeds of the Collateral, from the exercise of any enforcement action, or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

   9.11    Notices.

        (a)    Addresses.  All notices, demands, requests, directions and other communications (collectively, "*Notices*") required or expressly authorized to be made by the Loan Documents will be written and addressed (a) if to Borrower or any other Credit Party, to the address set forth for Borrower on the Agreement signature page or such other address as shall be notified in writing to Lender after the date hereof; and (b) if to Lender, at the address set forth for Lender on the Agreement signature page or such other address as shall be notified in writing to Borrower after the date hereof.  Notices may be given by hand delivery; by overnight delivery service, freight prepaid; or by U.S. mail, postage paid.

        (b)    Effectiveness.  Notices given as described above shall be effective and be deemed to have been received (i) upon personal delivery to a responsible individual at Lender's business office in

Contract No.: _____
Asset Nos.: 056453 et al.

Scottsdale, Arizona, if the Notice is given by hand delivery; (ii) one Business Day after delivery to an overnight delivery service, if the Notice is given by overnight delivery service; and (iii) two Business Days following deposit in the U.S. mail, if the Notice is given by U.S. mail.

9.12    Governing Law. The laws of the State of Arizona (without giving effect to its conflicts of laws principles) shall govern all matters arising out of, in connection with or relating to this Agreement and the other Loan Documents, including its validity, interpretation, construction, performance and enforcement; *provided, however*, that with respect to any married individual signing this Agreement who is not a resident of the State of Arizona, this Section shall not be a contractual choice of the community property laws of the State of Arizona.

9.13    Jurisdiction and Service of Process.

(a)    Submission to Jurisdiction. Any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the courts of the State of Arizona located in Maricopa County or of the United States for the District of Arizona, and Borrower and each other Credit Party accept for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; *provided, however*, that nothing in this Agreement shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state in which the Site is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under any Loan Document. Lender, Borrower and each other Credit Party hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(b)    Non-Exclusive Jurisdiction. Nothing contained in this Section shall affect the right of Lender to serve process in any manner permitted by Applicable Law or commence legal proceedings or otherwise proceed against any Borrower Party in any other jurisdiction.

9.14    WAIVER OF JURY TRIAL. LENDER, BORROWER, AND EACH OTHER CREDIT PARTY, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.15    Severability. Any provision of any Loan Document being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of any Loan Document or any part of such provision in any other jurisdiction.

9.16    Execution in Counterparts. This Agreement and the other Loan Documents may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement or such other Loan Document by facsimile transmission shall be as effective as delivery of a manually executed counterpart thereof.

9.17    Entire Agreement. The Loan Documents embody the entire agreement of the parties and supersede all prior agreements and understandings relating to the subject matter thereof, including the Commitment, and any prior letter of interest, proposal letter, commitment letter, fee letter, confidentiality, or other agreements involving Borrower or any other Borrower Party and any of Lender or any other Lender Party relating to a financing of substantially similar form, purpose or effect. The parties acknowledge and affirm that they did not rely on any statement, oral or written, not contained in the Loan Documents in making their respective decisions to enter into the agreements expressed in the Loan Documents.

9.18    Use of Name. Borrower and each other Credit Party agree (and Borrower shall cause each of the other Borrower Parties to so agree) not to issue any press release or other public disclosure (other than any document

filed with any Governmental Authority relating to a public offering of stock or equity interests of any Borrower Party) using the name, logo or otherwise referring to General Electric Company, Lender, any of their Affiliates, the Loan Documents, or any transaction contemplated thereby, without the prior consent of Lender, in Lender's sole discretion, except to the extent required to do so under Applicable Law and then only after consulting with Lender prior thereto.

9.19    Authorized Signature.    Until Lender shall be notified in writing by Borrower or any other Credit Party to the contrary, the signature of any Credit Party upon any Loan Document believed by Lender or any of Lender's officers, agents, or employees to be that of an officer or other authorized signatory of Borrower or such other Credit Party shall bind Borrower and such other Credit Party and be deemed to be the act of Borrower or such other Credit Party affixed pursuant to and in accordance with resolutions duly adopted by Borrower's or such other Credit Party's board of directors (or similar governing body), and Lender shall be entitled to assume the authority of each signature and authority of the individual whose signature it is or appears to be unless Lender has actual knowledge to the contrary.

9.20    Time of the Essence; Time Periods.    Time is of the essence for performance of the Obligations under each of the Loan Documents.  Unless otherwise expressly provided for in such Loan Document, the time for performance of any obligation or taking any action under such Loan Document shall be deemed to expire at 5:00 o'clock p.m. on the last day of the applicable time period provided for in such Loan Document.  If the time for the performance of any obligation or taking any action under this Agreement or such other Loan Document expires on a day other than a Business Day, the time for performance or taking such action shall be extended to the next succeeding Business Day.    Unless otherwise expressly stated, references in any of the Loan Documents to a particular time of day shall be to the local time in Phoenix, Arizona, and references to "month" shall be a reference to calendar months.

9.21    Certain Fees and Charges.    Borrower acknowledges and agrees that Lender reserves the right to impose fees or charges for returned checks, multiple payoff quotes within a certain period of time, additional copies of documents, and such other optional services it may offer to provide to Borrower during the term of the Loan. Lender will notify Borrower of the amount of the fee or charge if Borrower requests such an optional service. Lender may make available to Borrower a schedule of fees or charges for returned checks and such other optional services upon demand or from time to time; *provided, however*, such fees and charges are subject to change in Lender's sole discretion without notice to Borrower.

9.22    Authorization.    Borrower and each other Credit Party authorize its banks, creditors (including trade creditors), vendors, suppliers, customers, and each franchisor to disclose and release to the Lender Parties any and all information they may request from time to time regarding (a) any depository, loan or other credit account of Borrower or such other Credit Party; (b) the affairs and financial condition of Borrower, such other Credit Party, or any operator of the Site; and (c) the business operations at the Site, including Site level and entity level operating results.  Borrower and each such Credit Party also expressly authorize the Lender Parties, from time to time while any of the Obligations are outstanding, including during any period when a Default exists, to perform background, credit, judgment, lien and other checks, searches, inspections and investigations and to obtain personal and business credit reports and asset reports with respect to Borrower and the other Credit Parties and to answer questions about its credit experience with Borrower and the other Credit Parties.  All of the information which the Lender Parties obtain from time to time in accordance with this Section, together with all other information which the Lender Parties now possess or in the future may acquire with respect to Borrower, any of the other Credit Parties, the Collateral, or the business operations at the Site, whether pursuant to the Loan Documents or otherwise, is referred to as *"Credit Party Information."*

9.23    Permitted Disclosures.    Borrower and each other Credit Party authorize each Lender Party to disclose Credit Party Information as follows:  (a) to each franchisor or licensor of Borrower or other Credit Party, upon written request by such franchisor or licensor; (b) to any proposed transferee, purchaser, assignee, servicer, participant, lender, investor, ratings agency, or other Person with respect to any proposed Lender Transfer or sale of any of the Collateral; (c) to any of the other Lender Parties or any insurance or title company in connection with the transactions contemplated by the Loan Documents, including any action, suit, or proceeding arising out of, in connection with, or relating to, this Agreement or the other Loan Documents, the Loan, or any other transaction contemplated hereby, including in connection with the exercise of Lender's rights and remedies; (d) to the extent

such information is or becomes available to a Lender Party from sources not known by such Lender Party to be subject to disclosure restrictions; (e) to the extent disclosure is required by Applicable Law or other legal process or is requested or demanded by any Governmental Authority; and (f) as may otherwise be authorized in writing by Borrower. Borrower and each other Credit Party also authorize Lender and its Affiliates to distribute to, or publish for use by, third parties, statistical analyses relating to Borrower's operations, including unit-level and corporate level operating results, *provided, however*, that, without Borrower's prior written consent, such disclosure shall not attribute any such results to the Site, Borrower, any other Credit Party, or any operator or lessee of the Site. Borrower and each other Credit Party agree that the disclosures permitted by this Section and any other disclosures of Credit Party Information authorized pursuant to any of the Loan Documents may be made even though any such disclosure may involve the transmission or other communication of Credit Party Information from the nation of residence or domicile of such Credit Party or a Lender Party to another country or jurisdiction, and each Credit Party waives the provisions of any data privacy law, rule, or regulation of any applicable Governmental Authority that would otherwise apply to the disclosures authorized in this Section.

9.24     Corrections and Insertions. Lender may correct patent errors in the Loan Documents and fill in all blanks in this Agreement and the other Loan Documents consistent with the agreement of the parties.

9.25     Joint and Several Liability; Cross Indemnity.

(a)     Borrowers' Joint and Several Liability.  If this Agreement is signed by more than one Person as Borrower, references in this Agreement to Borrower are to each Borrower signing this Agreement, and the liability of each such Borrower with respect to the Obligations is joint and several. Each Borrower shall be a direct, primary and independent obligor and no Borrower shall be deemed to be a guarantor, accommodation party or otherwise secondarily liable for the Obligations pursuant to the Loan Documents. Each Borrower represents and warrants to Lender that Borrowers are engaged in operations that require financing on such a joint basis and, accordingly that each Borrower will benefit, directly or indirectly, from the loans and advances to be made pursuant to this Agreement; that the financing pursuant to this Agreement has been offered to Borrowers on a joint basis and would not be available to Borrowers on an individual basis on the terms and conditions offered pursuant to this Agreement; and that the benefits received by each Borrower is reasonably equivalent to the obligations undertaken by each Borrower. Each Borrower agrees that Lender may also conclusively rely on the actions of any of Borrowers to bind all Borrowers. Without limiting the foregoing:

(i)     The obligations of each Borrower pursuant to the Loan Documents shall not be affected, discharged or impaired by any of the following:  (A) the bankruptcy, disability, dissolution, incompetence, insolvency, liquidation, or reorganization of any Borrower or other Borrower Party; (B) any defense of any other Borrower Party to payment or performance of any or all obligations or enforcement of any or all Collateral; (C) the discharge, modification of the terms of, reduction in the amount of, or stay of enforcement of any or all liens and encumbrances or any or all obligations pursuant to the Loan Documents in any bankruptcy, insolvency, reorganization, or other legal proceeding or by law, ordinance, regulation, or rule (federal, state, or local); (D) any claim or dispute by any other Borrower Party concerning the occurrence of an Event of Default, performance of any obligations pursuant to the Loan Documents, or any other matter; (E) any waiver or modification of any provision of the Loan Documents that affects any other Borrower Party, whether or not such waiver or modification affects all of Borrower Parties; (F) the cessation of liability, release or discharge of any other Borrower Party, guarantor or other obligor for any reason; (G) the perfection or failure to perfect, release or discharge of any collateral or other security; (H) the exercise or failure to exercise any rights or remedies pursuant to the Loan Documents by Lender or any election of remedies by Lender; (I) any invalidity, irregularity or unenforceability in whole or in part of any of the Loan Documents or any limitation of the liability of any Borrower Party under the Loan Documents, including any claim that the Loan Documents were not duly authorized, executed, or delivered on behalf of any Borrower; (J) any other acts or omissions by Lender that result in or could result in the release or discharge of any other Borrower Party; or (K) the occurrence of any other event or the existence of any other condition that by operation of law or otherwise could result in the release or discharge of a surety, guarantor, or other persons secondarily liable on an obligation.

(ii)     Each Borrower unconditionally waives:  (A) any requirement that Lender first make demand upon, or seek to enforce or exhaust remedies against any other Borrower Party, or any other Person or any of the Collateral or other property of any Borrower Party or any other Person before demanding payment from or seeking to enforce the Obligations against such Borrower; (B) any and all rights, benefits and defenses which might otherwise be available under the provisions of Arizona Revised Statutes Sections 12-1641, 12-1642, 44-141, 44-142 or 47-3605, or Arizona Rules of Civil Procedure Rule 17(f), or any other applicable statutes, rules or common law principles or provisions which might operate to limit any Borrower's liability under, or the enforcement of, the Loan Documents; (C) diligence, presentment, protest, demand for performance, notice of acceptance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of extension, renewal, alteration or amendment, notice of acceptance of the Loan Documents, notice of default under any of the Loan Documents (except as provided in the Loan Documents), and all other notices whatsoever, except for notices specifically required pursuant to other provisions of the Loan Documents; (D) any obligation of Lender to provide any Borrower any information, including any information concerning any other Borrower Party or any Collateral; and (E) any other claim or defense that otherwise would be available based on principles of suretyship or guarantee or otherwise governing secondary obligations.

(iii)     All indebtedness, together with all rights of subrogation, contribution, reimbursement, and indemnity (including, without limitation, indemnification and reimbursement rights provided pursuant to this *Section 9.25*) (collectively, "*Intercompany Indebtedness*") from one or more Borrowers to another Borrower or Borrowers, now or in the future, is hereby subordinated to the Indebtedness of each Borrower to Lender. Any Intercompany Indebtedness, if Lender so requests, shall be collected, enforced and received by each Borrower as trustee for Lender and be paid over to Lender on account of the Obligations, but without reducing or affecting in any manner the liability of each Borrower under the other provisions of this Agreement and the Loan Documents.

(b)     Cross-Indemnity.  This *Section 9.25* is intended to provide for an allocation of the Obligations among Borrowers, but as more particularly described below, does not in any way limit the Obligations of any Borrower to Lender.  As between Borrowers, if any Borrower (the "*Overpaying Borrower*") pays (whether directly or by the application of Collateral), or is otherwise held liable for, obligations in excess of the Overpaying Borrower's Pro Rata Share, the other Borrowers will pay the amount of such excess to the Overpaying Borrower and will defend and indemnify the Overpaying Borrower for, from and against any claims, damages, loss and liabilities arising from or related to such overpayment. As used herein, "*Pro Rata Share*" means the amount of loan proceeds actually advanced to or for the benefit of each Borrower as reflected on the books and records of such Borrower. The Borrowers agree to maintain books and records accurately reflecting each Borrower's Pro Rata Share.  THIS *SECTION 9.25* IS ONLY INTENDED TO ALLOCATE PAYMENTS, LOSSES AND LIABILITIES AMONG BORROWERS IN ORDER THAT, AS BETWEEN THE BORROWERS, EACH BORROWER IS ULTIMATELY LIABLE FOR ITS PRO RATA SHARE AND IN ORDER THAT THE VALUE TO EACH BORROWER OF THE RESULTING RIGHTS AND CLAIMS AGAINST OTHER BORROWERS PURSUANT TO THIS *SECTION 9.25* WILL ASSURE THAT NO BORROWER IS RENDERED "INSOLVENT" BY VIRTUE OF THE OBLIGATIONS FOR PURPOSES OF STATE AND FEDERAL FRAUDULENT TRANSFER, FRAUDULENT CONVEYANCE AND SIMILAR LAWS AND STATUES.  NOTHING CONTAINED IN THIS *SECTION 9.25* SHALL IN ANY WAY LIMIT THE OBLIGATIONS OF ANY BORROWER TO LENDER OR OTHERWISE LIMIT THE JOINT AND SEVERAL NATURE OF ALL OF THE OBLIGATIONS.  EACH BORROWER SHALL BE FULLY LIABLE TO LENDER PURSUANT TO THE LOAN DOCUMENTS WITHOUT REGARD TO ANY ALLOCATION OF LOSSES AND LIABILITIES PURSUANT TO THIS *SECTION 9.25* OR OTHERWISE AND, NOTWITHSTANDING ANY SUCH ALLOCATION, EACH BORROWER HAS EXPRESSLY ASSUMED THE RISK THAT SUCH BORROWER'S ACTUAL LIABILITY MAY EXCEED SUCH BORROWER'S PRO RATA SHARE AND THAT OVERPAYMENTS MAY NOT ACTUALLY BE REIMBURSED OR INDEMNIFIED.  The rights and obligations among Borrowers pursuant to this *Section 9.25* shall survive the payment and performance of the Obligations, shall be

considered as Intercompany Indebtedness, and shall be subject to the subordination provisions of *Section 9.25.*

9.26    Transaction Characterization.    The Loan Documents are a contract to extend a financial accommodation (as such term is used in the Bankruptcy Code) for the benefit of Borrower. The Loan Documents evidence one unitary, non-severable transaction pertaining to the Collateral.

9.27    Interpretation.

(a)    Certain Terms. Except as expressly set forth in any Loan Document, all accounting terms not specifically defined in the Loan Documents shall be construed in accordance with GAAP (except for the term *"property"*, which shall be interpreted as broadly as possible, including, in any case, cash, securities, other assets, rights under Contractual Obligations and Permits and any right or interest in any real or personal property). The terms *"herein"*, *"hereof"* and similar terms refer to the Loan Document in which they appear as a whole. In the computation of periods of time from a specified date to a later specified date in any Loan Document, the term *"from"* means *"from and including"* and the words *"to"* and *"until"* each mean *"to but excluding"* and the word *"through"* means *"to and including."* The term *"including"* means *"including without limitation."* The term *"documents"* means all writings, however evidenced and whether in physical or electronic form, including all documents, instruments, agreements, notices, demands, certificates, forms, financial statements, opinions and reports. The term *"incur"* means incur, create, make, issue, assume or otherwise become directly or indirectly liable in respect of or responsible for, in each case whether directly or indirectly, and the terms *"incurrence"* and *"incurred"* and similar derivatives shall have correlative meanings. The term *"sole"* means "*sole and absolute.*"

(b)    Certain References. Unless otherwise expressly indicated, (i) references in this Agreement and any of the other Loan Documents to an "Exhibit," "Article," "Section," "Paragraph," "Schedule," "subsection," or "clause" refer to the appropriate Exhibit or Schedule to, or Article, Section, Paragraph, subsection or clause in, such Loan Document; and (ii) references in any Loan Document, to (A) any agreement or instrument include all exhibits, schedules, appendixes and annexes to such agreement or instrument and, unless the consent of Lender is required therefor but was not obtained, any amendment, restatement, or supplement to any term of such agreement or instrument from time to time; and (B) any statute, law, or ordinance or any Governmental Authority regulation or rule shall be to such statute, law, ordinance, regulation or rule, as modified from time to time and to any successor to any such statute, law, ordinance, regulation or rule, in each case as in effect at the time any such reference is operative. Titles of Articles, Sections, Paragraphs, Schedules, Exhibits and other divisions contained in any Loan Document are without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto. Unless otherwise expressly indicated, the meaning of any term defined (including by reference) in any Loan Document shall be equally applicable to both the singular and plural forms of such term.

9.28    Construction.    This Agreement and the other Loan Documents have been entered into by parties who are experienced in sophisticated and complex matters similar to the transactions contemplated by this Agreement and they are being entered into by the parties in reliance upon the economic and legal bargains contained in this Agreement and the other Loan Documents and shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party that prepared the instrument, the relative bargaining powers of the parties or the domicile of any party, but shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties to this Agreement.

9.29    Further Assurances.    At any time and from time to time, upon the written request of Lender and at the sole expense of Borrower, promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Lender may reasonably deem necessary or advisable (a) to obtain the full benefits of this Agreement and the other Loan Documents; (b) to protect, preserve, maintain and enforce Lender's rights in (and the priority of Lender's Lien on) any Collateral; or (c) to enable Lender to exercise all or any of the rights, remedies and powers granted in this Agreement or in any other Loan Document.

[SIGNATURE PAGE FOLLOWS]

**EXECUTED** effective as of the date first set forth above.

<div style="margin-left:40%">

BORROWER:

**BOSTON BLACKIES OF ARLINGTON HEIGHTS,
LLC,** an Illinois limited liability company

By:_____
Printed Name:_____
Its: _____
Date Signed: _____, 2009

Principal Place of Business and Address for Notices:
801 West Adams Street
Chicago, IL  60607-3035


**BOSTON BLACKIES LAKE COOK PLAZA, INC.,** an
Illinois corporation

By:_____
Printed Name:_____
Its: _____
Date Signed: \_\_ _____, 2009

Principal Place of Business and Address for Notices:
801 West Adams Street
Chicago, IL  60607-3035


**164 GRAND, INC.,** an Illinois corporation

By:_____
Printed Name:_____
Its: _____
Date Signed: _____, 2009

Principal Place of Business and Address for Notices:
801 West Adams Street
Chicago, IL  60607-3035

</div>

*GEFF smartDocs Form 1002*
*Rev 7/5/08*
4818-9619-5077.3

28

Contract No.: _____
Asset Nos.: 056453 et al.

**BOSTON BLACKIES NAPERVILLE LLC**, an Illinois
limited liability company


By:_____
Printed Name:_____
Its: _____
Date Signed: _____, 2009

Principal Place of Business and Address for Notices:
801 West Adams Street
Chicago, IL  60607-3035


**BOSTON BLACKIES OF RIVERSIDE PLAZA, INC.**, an
Illinois corporation


By:_____
Printed Name:_____
Its: _____
Date Signed: _____, 2009

Principal Place of Business and Address for Notices:
801 West Adams Street
Chicago, IL  60607-3035


**BOSTON BLACKIES OF WINNETKA, INC.**, an Illinois
corporation


By:_____
Printed Name:_____
Its: _____
Date Signed: _____, 2009

Principal Place of Business and Address for Notices:
801 West Adams Street
Chicago, IL  60607-3035


**BOSTON BLACKIES MANAGEMENT, INC.**, an Illinois
corporation


By:_____
Printed Name:_____
Its: _____
Date Signed: _____, 2009

Principal Place of Business and Address for Notices:
801 West Adams Street
Chicago, IL  60607-3035

**LENDER:**

**GENERAL ELECTRIC CAPITAL CORPORATION**, a
Delaware corporation

By: _____
Printed Name: _____
Its Authorized Signatory
Date Signed: _____, 2009

Address for Notices:
8377 East Hartford Drive
Suite 200
Scottsdale, Arizona 85255
Attention:  Portfolio Management

## SCHEDULE 1
## THE SITES

### LOAN DESCRIPTION

| Financing Purpose | Amount of Financing | Maximum Loan Amount |
|---|---|---|
| Operation of the Sites as a Permitted Concept in accordance with the Budget | 100% of the amounts approved by Lender in accordance with the Budget | $500,000 |

### SITE DESCRIPTION

| Site | GEFF Property Number | Concept | Address |
|---|---|---|---|
| 1 | 056453 | Boston Blackie's | 405 Lake Cook Road, Deerfield, IL 60015 |
| 2 | 056457 | Boston Blackie's | 73 Green Bay Road, Glencoe, IL  60093 |
| 3 | 056458 | Boston Blackie's | 164 E. Grand Ave., Chicago, IL  60611 |
| 4 | 056459 | Boston Blackie's | 222 E. Algonquin Road, Arlington Heights, IL  60005 |
| 5 | 056461 | Boston Blackie's | 916 S. Route 59, Naperville, IL 60540 |
| 6 | 056460 | Boston Blackie's | 120 S. Riverside Plaza, Chicago, IL 60606 |

**Site 1 Lease Information**
Lessor: LaSalle National Bank, not individually but solely as Trustee under Trust Agreement dated July 1, 1986 and known as Trust No. 111294, by its beneficiary, Lake Cook Plaza Associates Limited Partnership.
Description of Lease Documents: That certain Lease dated June 5, 2000, between LaSalle National Bank, not individually but solely as Trustee under Trust Agreement dated July 1, 1986 and known as Trust No. 111294, by its beneficiary, Lake Cook Plaza Associates Limited Partnership, as Landlord, and Boston Blackies Lake Cook Plaza, Inc., as Tenant.

**Site 2 Lease Information**
Lessor: United Investors  Inc.
Description of Lease Documents: That certain Lease dated May 1, 2000, between United Investors Inc., as Landlord, and Nick Giannis & Boston Blackies of Winnetka, Inc., as Tenant.

**Exhibit B**

### Site 3 Lease Information

Lessor: Jefferson State Bank, as Trustee

Description of Lease Documents: That certain Lease dated August 1, 1998, between Jefferson State Bank, as Trustee, as Landlord, and 164 Grand, Inc., as Tenant.

### Site 4 Lease Information

Lessor: Boston Blackies Properties II, LLC

Description of Lease Documents: That certain Lease dated December 31, 2003, between Boston Blackies Properties II, LLC, as Landlord, and Boston Blackies of Arlington Heights, LLC, as Tenant.

### Site 5 Lease Information

Lessor: Fox River Commons Shopping Center, L.L.C.

Description of Lease Documents: That certain Lease dated December 10, 2006 between Fox River Commons Shopping Center, L.L.C., as Landlord, and Boston Blackies Naperville LLC, as Tenant.

### Site 6 Lease Information

Lessor: Solano Associates

Description of Lease Documents: That certain Lease dated September 18, 2000 between Solano Associates, as Landlord, and Boston Blackies of Riverside Plaza, Inc., as Tenant.

**Boston Blackies**
**Riverside**
**13 week Cash Flow**

| | | Week 1 W/E 12/13/2009 | Week 2 W/E 12/20/2009 | Week 3 W/E 12/27/2009 | Week 4 W/E 1/3/2010 | Week 5 W/E 1/10/2010 | Week 6 W/E 1/17/2010 | Week 7 W/E 1/24/2010 | Week 8 W/E 1/31/2010 | Week 9 W/E 2/7/2010 | Week 10 W/E 2/14/2010 | Week 11 W/E 2/21/2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Balance** | | | (32,883) | (3,457) | (26,144) | (17,189) | (25,173) | 4,453 | (17,905) | 11,769 | (13,246) | 12,663 |
| **Receipts:** | | | | | | | | | | | | |
| Net Sales F&B | | 41,787 | 41,543 | 41,858 | 41,970 | 41,790 | 41,790 | 41,852 | 41,851 | 41,821 | 41,828 | 41,838 |
| Comps & voids | 5.93% | 2,478 | 2,464 | 2,482 | 2,478 | 2,478 | 2,478 | 2,482 | 2,482 | 2,480 | 2,483 | 2,481 |
| Sales tax | 11.80% | 4,801 | 4,773 | 4,809 | 4,822 | 4,802 | 4,802 | 4,809 | 4,809 | 4,805 | 4,806 | 4,807 |
| Subtotal | | 49,066 | 48,780 | 49,149 | 49,282 | 49,069 | 49,070 | 49,143 | 49,141 | 49,106 | 49,115 | 49,126 |
| Other | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | |
| Gross Receipts | | 46,588 | 46,317 | 46,647 | 46,793 | 46,591 | 46,592 | 46,661 | 46,659 | 46,626 | 46,634 | 46,645 |
| **Disbursements:** | | | | | | | | | | | | |
| **Labor** | | | | | | | | | | | | |
| Payroll | 27.10% | 29,009 | 29,009 | 29,009 | 29,009 | 29,009 | 29,009 | 29,009 | 29,009 | 29,009 | 29,009 | 29,009 |
| Taxes | | | | | | | | | | | | |
| Benefits | | 434 | 434 | 434 | 434 | 434 | 434 | 434 | 434 | 434 | 434 | 434 |
| Bonus | | | | | | | 1,063 | | | | | |
| Subtotal | | 29,443 | 29,443 | 29,443 | 29,443 | 29,443 | 29,443 | 29,443 | 29,443 | 29,443 | 29,443 | 29,443 |
| Paper supplies | 1.6% | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 |
| Subtotal | | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 | 3,510 |
| **Utility** | | | | | | | | | | | | |
| Rent | | 16,130 | | | 16,130 | | | 16,130 | | | 16,130 | |
| Utilities | | | | 2,675 | | | 2,674 | | | 2,674 | | 2,673 |
| R&M | | | | | | | | | | | | |
| Subtotal | | 12,017 | 11,947 | 12,037 | 12,069 | 12,017 | 12,018 | 12,035 | 12,035 | 12,026 | 12,028 | 12,031 |
| Subtotal | | 12,017 | 11,947 | 12,037 | 12,069 | 12,017 | 12,017 | 12,035 | 12,035 | 12,026 | 12,028 | 12,031 |
| **Breakfast Operating Esp** | | | | | | | | | | | | |
| Cleaning supplies | 3.41% | | | | | 734 | | | | 732 | | |
| Credit Card Disc | 2.17% | 104 | 103 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 104 |
| Kitchen supplies | 0.2% | | | | | | | | | | | |
| Linen | 0.67% | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | |
| Other | 0.50% | 248 | 246 | 248 | 249 | 248 | 248 | 248 | 248 | 248 | 248 | |
| Subtotal | | 352 | 350 | 353 | | 352 | 352 | 352 | 352 | | | |
| **Fixed Operating Expense** | | | | | | | | | | | | |
| Equipment Lease | | 513 | 510 | 567 | | 432 | 567 | 567 | | 432 | 567 | 567 |
| Garbage | | | | | | | | | | | | |
| Lnb Ins | 1.11% | 513 | 510 | 514 | 516 | 514 | 514 | 514 | 514 | 514 | 514 | 514 |
| Pest Control | | | | 169 | | | 169 | | | | | 169 |
| Subtotal | | 16,643 | 510 | 3,189 | 16,646 | 514 | 3,188 | 514 | 514 | 16,644 | 514 | 3,187 |
| Other | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | |
| **Non-Operating** | | | | | | | | | | | | |
| Interest | | | | | | | | | | | | |
| Management Fee | 0.8% | 574 | 574 | 574 | 574 | 574 | 574 | 574 | 574 | 574 | 574 | 574 |
| Subtotal | | 574 | 574 | 574 | 574 | 574 | 574 | 574 | 574 | 574 | 574 | 574 |
| **Extra-Ordinary Items** | | | | | | | | | | | | |
| Outstanding Payroll Liability | | 20,443 | | 19,622 | 7,500 | 7,500 | 19,290 | 19,290 | 7,500 | | 1,310 |
| PACA Claims | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Subtotal | | 20,443 | | 19,622 | | 7,500 | | 19,290 | 19,290 | 7,500 | | 19,235 |
| **Cash Sources /(Uses)** | | (32,883) | 29,426 | (3,457) | 8,955 | (7,984) | 29,625 | (22,358) | 29,674 | 25,015 | 25,909 | (18,913) |
| **Ending Cash Balance** | | (72,833) | (32,883) | (3,457) | (26,144) | (17,189) | (25,173) | 4,453 | (17,905) | 11,769 | (13,246) | 12,663 | (6,250) |